**John WILLIAMS, Leonard Altman, Anthony Richards, Charles Lewis, Individually and on Behalf of All Other Persons Similarly Situated, Plaintiffs,**

v.

**Benjamin WARD, in his Official Capacity as Police Commissioner of the City of New York, et al., Defendants.**

**No. 85 CIV. 1045 (CBM).**

United States District Court,
S.D. New York.

July 2, 1987.

Caesar D. Cirigliano, Criminal Defense Div., The Legal Aid Society by Steven G. Asin, Ivar Goldart, New York City, for plaintiffs.

Peter L. Zimroth, Corporation Counsel, Office of the Corporation Counsel, City of New York by Jeffrey E. Glen, Terrence R. Real, Dynda Andrews, of counsel, New York City, for defendants.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

This is a civil rights class action brought by the plaintiffs pursuant to 42 U.S.C. Section 1983. This court finds that it has jurisdiction over this action pursuant to 28 U.S.C. Section 1331 and 1343(a)(3).

The action is brought by the named plaintiffs on behalf of themselves and the class which is all persons in New York, Bronx, Kings and Queens Counties in the City of New York now or in the future arrested without a warrant and held in detention by defendants prior to having the probable

cause bases for their arrest reviewed by a neutral magistrate.

The plaintiffs claim that in violation of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution, defendants failed to perform their duty and expeditiously complete the necessary administrative steps incident to the arrests of the plaintiffs and the class and then to promptly have the probable cause bases for these arrests reviewed by a neutral magistrate.

The administrative steps to which the plaintiffs refer are those steps necessarily incident to an arrest and which must be completed in order for a state judge to review the probable cause basis of the arrest.

The plaintiffs allege that in New York, Bronx, Kings and Queens Counties, pursuant to state and local law and custom and practice, the first occasion on which the probable cause basis of a person's arrest is subject to review by a neutral magistrate is that person's appearance at his or her arraignment.

Plaintiffs say that by allowing substantial periods of time to elapse during which no arrest processing is performed and by performing tasks which are not necessary administrative steps incident to an arrest, defendants extend the time required to complete the necessary administrative steps incident to an arrest. Therefore, plaintiffs claim, defendants detain plaintiffs for extended periods without having the probable cause bases for their arrests reviewed by a neutral magistrate.

Plaintiffs and the class seek, by this action, a prompt completion of the necessary administrative steps incident to their arrests and prompt judicial review of the probable cause bases for their arrests after those steps have been completed.

In lieu of a trial in this case, the parties have stipulated to certain facts which are hereby incorporated into this opinion. Those stipulated facts are attached hereto as Exhibit A. In addition to the facts stipulated by the parties on November 7, 1986, the court finds that it is undisputed that defendants have added additional po-

lice personnel and, at the urging of defendants, New York State has increased the number of courtrooms and court personnel involved in the arrest and arraignment processes. However, the court finds that the time which elapses between arrest and arraignment in New York City, in the four counties involved in this action, greatly exceeds 24 hours. The court also finds that some of the steps taken by defendants are not necessary steps incident to the arrest, but include other steps such as fingerprinting. The court finds that a period of seven hours is sufficient to complete all necessary steps incident to the arrest of plaintiffs and members of their class, except in exceptional circumstances.

The court finds that it should take no more than six or seven hours for steps necessary in connection with the arrest to be completed. However, this period is expanded to as much as 17 hours by taking other steps such as fingerprinting which are not absolutely necessary to complete arrest.

The court finds, in addition, that a period of 24 hours is sufficient for all steps incident to an arrest to be finalized and all steps necessary for the New York arraignment under present procedures.

The court finds that a period of more than 24 hours, except in exceptional cases, to complete the arrest of a person and to make the necessary preparations incident to the New York arraignment procedures should not exceed 24 hours. Any longer period, except in exceptional circumstances, has not been justified by defendants.

■ The court finds and concludes that a period of detention which exceed 24 hours prior to having a probable cause determination by a neutral magistrate violates the rights of plaintiffs and members of their class under the Fourth and Fourteenth Amendments to the Constitution.

In *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the Supreme Court established an outside limit on the period of time a person arrested without a warrant may be detained absent a probable cause determination by a neutral

magistrate. The Supreme Court held the Fourth Amendment requires a determination of probable cause as a prerequisite to extended restraint of liberty following an arrest. While the Supreme Court affirmed that the existence of probable cause to arrest should be determined by a neutral magistrate prior to arrest whenever possible, it recognized that requiring a pre-arrest probable cause determination by a neutral magistrate in all circumstances would be impractical and an intolerable handicap to legitimate law enforcement.

Thus, the court acknowledged that arrests based solely upon a police officer's on-the-scene determination of probable cause are permissible under the Fourth Amendment. However, the court held that once an arrest is effected, the necessity for detaining the suspect beyond a brief period of detention to take the administrative steps incident to an arrest evaporates.

The Supreme Court has never gone further in defining what it meant when it referred to a brief period of detention. However, a series of decisions rendered in similar cases have relied upon the court's decision in *Gerstein* and determined that persons arrested without a warrant are entitled to a judicial determination of probable cause within 24 hours of their arrest or less, except where exceptional circumstances are presented in individual cases. *Bernard v. City of Palo Alto*, 699 F.2d 1023, Ninth Circuit (1983); *Sanders v. City of Houston*, 543 F.Supp. 694, Southern District of Texas (1982), *Lively v. Cullinane*, 451 F.Supp. 1000, District of Columbia (1978).

The court concludes that the plaintiffs are entitled to a declaratory judgment in this case, declaring that detention beyond 24 hours before a probable cause determination is made before a neutral magistrate violates their constitutional rights.

This action was originally filed in early 1985. Shortly thereafter the case was placed on the suspense calendar of this court to give the parties an opportunity to resolve the issues presented without the necessity for proceeding with this action. For a period of time the parties sought to resolve the issue before a mediator, former federal Judge Harold Tyler.

In October, 1986, however, when it was apparent that the negotiations were not getting much accomplished and when the arrest to arraignment delay began to increase drastically, plaintiffs reactivated the case and moved for a preliminary injunction.

On October 17, 1986, this court entered an order advancing the trial and consolidating it with the hearing on the motion for preliminary injunction. Thereafter, the parties agreed to submit stipulated facts which were subsequently submitted and referred to above and are now incorporated herein.

The plaintiffs seek an injunction in this case which would enjoin the defendants from detaining plaintiffs and members of their class in custody after the expiration of four hours from the time of their arrest without a probable cause determination having been made. The court finds that four hours may be impractical in most cases. The court finds, however, that since a great deal of the delay in getting an arrestee to a probable cause hearing in the past and at present has been due to the actions of the defendants in not getting arrestees promptly before a state judge for probable cause determination, that the plaintiffs are entitled to some injunctive relief.

The court finds that the injunction should enjoin the defendants from keeping an arrestee in custody after the expiration of 24 hours without a probable cause determination. The court finds that such an injunction would permit the present arraignment procedures in New York to go forward without change. These procedures contemplate that at an arraignment proceeding the arrestee will be represented by counsel and that pleas of guilty may be taken and bail arrangements made where necessary.

The injunctive relief requested will enjoin the defendants from taking more than seven hours to complete arrangements necessary and incidental to the arrest so that

other steps such as fingerprinting and interviews by counsel can take place before the arraignment and the expiration of 24 hours.

## EXHIBIT A

### STIPULATED STATEMENT OF FACTS

The parties having conferred among themselves and with the Court pursuant to F.R.C.P. 16, the following are adopted as the Stipulated Statement of Facts herein:

### I. UNDISPUTED FACTS

It is hereby stipulated and agreed by and between the parties that the following facts are not in dispute, that there are no relevant facts in dispute, and that this statement and any accompanying exhibits shall constitute the record in this matter:

1. Plaintiffs are the class of all persons in New York, Bronx, Kings and Queens Counties who now or in the future are arrested without a warrant and held in detention by defendants prior to having the probable cause bases for their arrests reviewed by a neutral magistrate. The request for class-action certification is pending. References throughout this pre-trial order to arrestees are to the plaintiff class.

2. Each named plaintiff in this action was arrested without a warrant and based on the arresting officer's determination of probable cause for this arrest was physically detained by defendants. Each named plaintiff was taken to a New York City Police Department precinct and then to the Police Department's New York County Central Booking facilities at One Police Plaza in Manhattan. Each named plaintiff was subsequently transferred to a detention cell at the Criminal Courts Building, 100 Centre Street in New York County. As of 11:00 a.m. on February 7, 1985, the approximate time when the original complaint in this action was filed, none of the named plaintiffs had been arraigned or presented to a court for any other purpose.

3. Plaintiff John Williams was arrested in New York County at approximately 1:15 a.m. on February 6, 1985. He was physically detained by defendants from the time of his arrest until he was arraigned at approximately 8:10 a.m. on February 8, 1985, a period of approximately 55 hours.

4. Plaintiff Leonard Altman was arrested in New York County at approximately 1:15 a.m. on February 6, 1985. He was physically detained by defendants from the time of his arrest until he was arraigned at approximately 2:35 a.m. on February 8, 1985, a period of approximately 49 hours.

5. Plaintiff Anthony Richards was arrested in New York County at approximately 1:15 a.m. on February 6, 1985. He was physically detained by defendants from the time of his arrest until he was arraigned at approximately 9:40 a.m. on February 8, 1985, a period of approximately 56 hours.

6. Plaintiff Charles Lewis was arrested in New York County at approximately 1:00 a.m. on February 6, 1985. He was physically detained by defendants from the time of his arrest until he was arraigned at approximately 9:40 a.m. on February 8, 1985, a period of approximately 56 hours.

7. Defendant Benjamin Ward is Police Commissioner of the City of New York, the chief executive officer of the New York City Police Department, chargeable with, and responsible for, the policies and practices of the police force and the enforcement of law. (New York City Charter Section 434.) References throughout this pre-trial order to "police", "police officer", "Police Department" and "department" are to defendant Ward and the New York City Police Department.

8. Richard Koehler is Commissioner of Correction of the City of New York and head of the New York City Department of Correction. As Commissioner of Correction, he has the "sole power and authority concerning the care, custody and control of all court pens for the detention of prisoners while in the criminal courts of the City of New York ... and the supreme court in the counties of New York, Bronx, Kings, Queens and Richmond ..." (New York City Charter Section 623(2)).

9. Edward I. Koch is Mayor of the City of New York, the chief executive officer of

the City of New York. As Mayor, he is responsible for the administration of all departments of the City of New York. (New York City Charter Sections 3 and 6.)

10. In virtually all criminal cases in the City of New York, arrestees are not provided with an opportunity for a judicial review of the probable cause bases of their detention following warrantless arrests, other than as such review occurs at their arraignment before a "local criminal court" (New York Criminal Procedure Law ["CPL"] § 100.55) or subsequently.

11. The "local criminal court" in which initial court appearances are made in the City of New York is the Criminal Court of the City of New York. References throughout this pretrial order to "Criminal Court" and to "court" are to the New York City Criminal Court. (New York City Criminal Court Act, Art. II, § 20.)

12. The Criminal Court of the City of New York is part of the New York State Unified Court System. New York State Constitution, Art. 6, Section 1. It is under the administrative supervision of the administrative board of the judicial conference which consists of the chief judge of the State Court of Appeals (the highest court) and the presiding justices of the four appellate divisions (the intermediate appellate court). Const. Art. 6, § 28.

13. The legislature of the State of New York and the Office of Court Administration determine the number and assignment of judges to particular courts, including the New York City Criminal Court, and provide for the cost of operating the courts. Const. Art. 6, § 29. Local governments provide and pay for the maintenance and operation of courthouses and physical plants, as necessary and appropriate. The Mayor of the City of New York appoints individuals to the Criminal Court judgeships designated by the state legislature, but he has no power to increase or decrease the number of judges in the court.

14. The initial eleven to fifteen hours after a warrantless arrest are consumed in

police functions as set forth in Paragraphs 15 to 44, below. The functions included in this period do not include the production of an arrestee in the courthouse or the taking of the Police Department's official photograph.

15. The Police Department maintains a 24–hour central booking facility in each of the following counties: New York, Bronx, Kings and Queens. The central booking facilities in Queens and Bronx Counties are located in the courthouse, while in New York and Kings Counties the central booking facilities are located approximately one-half mile away.

16. After a warrantless arrest in New York City, a police officer conducts a frisk search at the scene of the arrest and usually transports the arrestee from the scene of the arrest to the officer's precinct stationhouse and then to the central booking facility in the County in which the arrest was made. On occasion, the officer transports the arrestee directly to a central booking facility.

17. While detained at a precinct stationhouse, an arrestee is searched by a police officer and secured.

18. During the arrestee's detention at the precinct stationhouse, the arresting officer reviews the arrest with a supervising police official and a determination is made of the appropriateness of the arrest, the charges to be lodged and the need for additional investigation.

19. During this detention, the arresting officer also prepares several police forms, including a complaint arrest report, a property voucher form, and other forms as appropriate. The officer fills out a handwritten copy of an On Line Booking System (hereinafter OLBS) arrest report with approximately 100 data elements at the precinct or subsequently at Central Booking. (Copies of a complaint report and an OLBS arrest report are attached hereto as Exhibits 1 and 2.)*

* EDITOR'S NOTE: With the approval of the court, exhibits referred to herein have been

omitted for purposes of publication.

20. Pursuant to Operations Order 101, 11/1/85, if the time for precinct procedures is anticipated to exceed two hours, the Patrol Guide directs that the arrestee's fingerprints be taken at the precinct. These fingerprints are to be sent by car to the appropriate central booking facility, prior to transport of the arrestee, for electronic transmission to the New York State Division of Criminal Justice Services (DCJS) in Albany for commencement of a check for any prior criminal record. (See copy of Operations Order No. 101, 11/1/85, attached hereto as Exhibit 3.)

21. Despite Operations Order #101–11/1/85, an arrestee's paperwork and fingerprints usually are not taken to a central booking facility until the arrestee is taken to a central booking facility, which occurs on an average of 4 to 6 hours after arrest. (See Compilation and Range of Precinct to Central Booking, Numbered Precincts Only, as Exhibit 4.)

22. In the Midtown South Precinct in Manhattan, fingerprints are taken at the precinct for transmission to DCJS over the precinct's own electronic equipment to commence the "record check" prior to the time the arrestee is taken to Central Booking.

23. While an arrestee is detained at a precinct stationhouse, a district attorney may be notified and may participate in the investigation of the crime with which the arrestee is charged.

24. Either a district attorney or a police officer may decide to further investigate the charges against an arrestee. When this occurs, an arrestee may or may not be moved to a central booking facility until the further investigation is completed.

25. If the arrest is for a misdemeanor or violation (petty offense), a police officer may release the arrestee from custody and serve him with an appearance ticket, CPL 140.20(2) and (3), CPL Art. 150.20 and 160.-10, designating the date, time and court for arraignment. CPL 150.10. ·New York City police officers issue appearance tickets and release arrestees pursuant to the policy set forth in the "patrol guide". (See patrol guide section attached hereto as Exhibit 5.)

26. Between October 13th and 19th, 1986, there were 5,547 arrests in the four counties affected by this action; 2,614 were misdemeanor arrests, for which less than 533 appearance tickets were issued. (See daily On Line Booking System average arraignment time summaries, attached hereto as Exhibit 6.)

27. As clocked by police booking computers, the police move arrestees from the street, through the precinct, and on to the appropriate central booking facility in an average of four to six hours.

28. Once an arrestee is taken to Central Booking, the police: (a) photograph the arrestee, (b) take his fingerprints (if not previously taken), (c) search and secure him, (d) provide a supervisory review and approval of the arrest charges, (e) enter the information from the OLBS arrest report into the computer (with the arresting officer available for consultation), and (f) electronically transmit fingerprints and identification data electronically to DCJS to obtain the arrestee's criminal record (a "rap sheet") and any outstanding warrants. The pace at which an arrestee's 100 element OLBS arrest report is entered into the OLBS computer varies with the number of arrest reports awaiting entry, the number of machines available, and the number of operators who are on duty at any given time. Generally, it takes one to two hours for processing arrestees at Central Booking.

29. In New York, Kings, and Bronx Counties, the fingerprints and other information are transmitted to DCJS by laser facsimile equipment and are received in Albany less than 30 seconds after transmission begins. In Bronx County, the fingerprints and other information are transmitted for one-half hour out of every hour under a sharing arrangement with Nassau County. In Queens County, the fingerprints and information are transmitted by datalog equipment and are received in Albany either 9 or 14 minutes after transmission begins, depending on the equipment used. Laser transmission is faster, while datalog transmission has higher resolution quality. The pace at which an arres-

tee's fingerprints are electronically transmitted to DCJS and at which DCJS returns a criminal justice history is returned varies with (a) the number of personnel available to take fingerprints, (b) the number of Police Department machines available to transmit fingerprints, (c) the number of DCJS machines available to receive fingerprints, (d) the number of DCJS personnel available to process fingerprints and reports, (e) the number of DCJS machines available to transmit criminal justice history records, and (f) the number of Police Department machines available to receive and print criminal justice history records. Typically, there is one transmitting and one receiving machine, along with one back-up for each, available in each central booking location, to match DCJS facilities.

30. On average, DCJS returns "rap sheets" to Central Booking about three hours after a readable set of fingerprints has been received. DCJS informs the Police Department that a fingerprint is not readable within minutes after the print is received and read by DCJS personnel. Prints may be unreadable (a) because of print quality or (b) because of technical limitations of the transmitting equipment, telephone lines or receiving equipment.

31. There is no statutorily or otherwise legally established form for criminal justice history reports. The format currently being used was developed by DCJS in consultation with the police, the courts, and the prosecutors. The police, courts and prosecutors have agreed to use, and are using, "abbreviated" RAP sheets for Manhattan prostitution cases. Prostitutes often have exceedingly long RAP sheets—up to 100 pages or more—which take about half an hour to print. While one arrestee's RAP sheet is being printed, no other RAP sheets can be transmitted. By "abbreviating" portions of the record, a 100–page RAP sheet is condensed to about 30 pages, and printing time is reduced by more than two-thirds. Agreements are being explored by the police with prosecutors and the courts to "abbreviate" reports in other boroughs and for appropriate crimes other than prostitution.

32. The rap sheet includes a list of reportedly outstanding warrants as well as alleged aliases. An alias is any name which differs from the one provided by the arrestee, including any substantial spelling difference, or reported use of a different surname on this or any listed arrest. If such outstanding warrant and alias data are reported, the police confirm it by checking the data against New York State Office of Court Administration ("OCA") computer information, since DCJS warrant information is often out-of-date or incomplete. This check takes approximately 1 hour.

33. A police messenger then delivers a copy of the rap sheet and the OLBS arrest report to the district attorney's complaint room. A second copy of the rap sheet is made available to the Criminal Justice Agency (CJA). The remaining copies of the rap sheet along with the warrant information and the arrest report remain with the police. Deliveries are made once every hour, unless a larger than normal number of papers requires an additional delivery within that time.

34. The arrestee, in the meantime, is being interviewed at Central Booking by Criminal Justice Agency (CJA) employees regarding eligibility for release at the arraignment proceeding. CJA combines its interview information with rap sheet data and such other information as it collects by the time of arraignment to be used in connection with any application for pre-trial release.

35. After the arresting officer has checked the arrestee in at Central Booking and completed his duties, he goes, without waiting for the return of the rap sheet from DCJS, to the appropriate district attorney's complaint room, also called "ECAB" (Early Case Assessment Bureau), with a handwritten copy of the arrest report, to be interviewed by the prosecutor in connection with preparation of the accusatory instrument.

36. New York State Criminal Procedure Law is silent on the participation of a district attorney in the post-arrest process.

37. In the vast majority of cases in New York City, accusatory instruments are pre-

pared by district attorneys. In numerous New York State counties outside New York City accusatory instruments are prepared by local police officials rather than district attorneys. In limited categories of prostitution-related offenses in 1986, the New York City Police Department has drawn accusatory instruments.

38. At the complaint room, the assistant district attorney interviews the arresting officer, and any witnesses and other available persons as necessary, sufficiently to assess the appropriate charges. The assistant district attorney also decides whether the case should go to the Grand Jury and prepares notices required by the Criminal Procedure Law, *e.g.*, notices of requests for alibi witnesses, notices of statements, physical evidence, and identification, and notices of intent to present the case to a Grand Jury. In addition, the assistant district attorney drafts the required court documents, determines the strength of the case based on available evidence and evaluation of witnesses and circumstances, and determines an appropriate plea, if any. The assistant district attorney's assessment is designed to shape all subsequent actions of his office.

39. If the assistant district attorney reviewing the case determines that the facts related to him are not sufficient, he can decline prosecution and direct release of an arrestee in custody.

40. After the prosecutor completes the complaint and all required notices, these papers are typed, and the arresting officer attests to the complaint.

41. In general, once the sworn complaint, rap sheet, and the CJA pre-trial release report are available for each arrestee taken into custody in connection with the arrest, the Police Department assembles, for each case, four sets of papers, with each set usually containing the complaint, the CJA report, and the rap sheet. These four sets of papers are prepared for the court, the defense counsel, the District Attorney, and the Police Department.

42. As described below, the Police Department delivers all four sets of papers for each case to the Criminal Court's docket room.

43. In New York County, the police do not deliver the papers on each case to the docket room until the arrestees are physically present in the courthouse. The police are prepared to deliver these papers when the papers are ready and prior to the time that the arrestees are in the courthouse. The Criminal Court docket room, however, will not accept these papers until the arrestees are physically in the courthouse. The Court Clerk has adopted this policy in an effort to coordinate production of the arrestee in the arraignment court with the delivery of the papers to the courtroom. In 1986, arrest volume has increased at least 14 percent over the preceding year. Since July, 1986, arrest volume has increased at an even greater rate. During this period of high-arrest volume and when the courthouse detention facilities set aside for arrestees are filled, the arrestee will be transferred from Central Booking to a police precinct stationhouse and transported to the Courthouse only when room becomes available in the courthouse arrestee detention facilities.

44. In Kings, Queens, and Bronx Counties, the police deliver the papers on each case to the docket room when the papers are ready regardless of whether the arrestee is physically present in the courthouse detention facilities. From time to time, the production of arrestees in the courtroom may not be coordinated with the delivery of the papers to the courtroom. Unlike New York County, which has a 24-hour docket room, the docket rooms in these three counties are closed from approximately 1 a.m. to 8 a.m.

45. At the docket room, the Criminal Court assigns an arraignment docket number to the case and prepares an arraignment part calendar. This calendar is primarily a record-keeping device for the docket room and public and is generally not used by arraignment judges to call cases or determine the order in which arrestees will be arraigned. In New York County it is never used to call cases or determine the order of arraignment.

46. Once a docket number has been assigned to the case, a docket room clerk delivers the papers on each case to the arraignment court room. Thereafter, a police official directs that the appropriate arrestees be produced from the precincts, central booking facility, or the detention facilities in the courthouse. A police officer escorts these arrestees from the detention facilities to the so-called feeder pens behind the arraignment courtroom. En route, the official photograph ("mug shot") is taken for those arrestees accused of felonies or certain misdemeanors.

47. Each time a transfer of custody of an arrestee occurs between the police and the Department of Correction (which operates the courthouse detention facilities) or between police officers, a ledger entry is made to account for the arrestee.

48. In New York County, the detention facilities set aside for arrestees in the courthouse are open 24 hours a day and can hold 263 arrestees. In Kings County, the detention facilities set aside for arrestees can hold 150 arrestees while the arraignment court is in session, and 60 arrestees overnight when the arraignment court is not in session. In Queens County, the detention facilities set aside for arrestees can hold 72 arrestees while the arraignment court is in session; arrestees are held overnight in the central booking facility in the courthouse when the arraignment court is not in session. In Bronx County, the detention facilities set aside for arrestees can hold 142 arrestees in the building while the arraignment court is in session, and as at least a temporary arrangement, 45 arrestees can be held overnight when the arraignment court is not in session. The practice of holding arrestees overnight in detention cells in Kings and Bronx Counties was initiated in September 1986. The number of detainees held is determined by the City of New York. The rated capacity of detention facilities for pre-arraignment detainees (arrestees) is established by the City of New York. In each county, arrestees are segregated in the detention facilities into the following groups: male adults, male youths, females, and (in New York County) homosexuals. Segregation re-quirements reduce the maximum capacity of these facilities.

49. As of September 1986, in New York County, there are five arraignment parts, three on the day shift (including one that deals primarily with desk appearance tickets issued for misdemeanors), one on the evening shift, and one on the night ("Lobster") shift with extra parts as needed; in the Bronx and Queens there are, respectively, two arraignment parts each, day and evening, with extra parts as needed; in Brooklyn, there are three arraignment parts on weekdays, two day and one evening, and two on weekends, one day and one evening, with extra parts as needed. Arraignment parts in New York, Bronx, Kings and Queens Counties are open every day of the year. In New York County, there is at least one arraignment part open 24 hours a day. In Bronx, Kings and Queens Counties, there are no arraignment parts open from approximately 1 a.m. to 9 a.m.

50. Defendant City of New York is responsible for constructing and maintaining the non-federal courthouses within New York, Bronx, Kings and Queens Counties. When seeking to construct, maintain, or reconfigure the space within these courthouses, the City consults with and seeks agreement from OCA, local prosecutors, and other agencies utilizing space within these buildings.

51. When the arrestee is produced in the feeder pens adjacent to the arraignment courtroom and the court papers have been delivered to the courtroom (see paragraph 46, above), he is available for the first time to be interviewed by defense counsel. Arrestees have the right to the aid of counsel at an arraignment pursuant to New York Criminal Procedure Law § 170.10(3).

52. Defendant City of New York is responsible under New York Law (*see* County Law art. 18–B) for providing and paying for defense counsel for persons charged with crimes within the City of New York who cannot afford a lawyer.

53. At the arraignment, the court assigns either The Legal Aid Society pursuant to the Society's contract with the City of New York or private counsel pursuant to County Law 18–B to represent indigent persons who are charged with crimes and not otherwise represented.

54. As a matter of practice, defense counsel represent arrestees at arraignment prior to a court determination of indigency, and a determination of indigency prior to arraignment is generally not undertaken. At the court's direction, defense counsel represents arrestees at arraignment who are not indigent. Only a small proportion of arrestees at arraignment are not considered indigent.

55. Arrestees generally are interviewed by defense counsel in the feeder pens behind the arraignment courts. In New York County, the number of interview booths in the feeder pens area range from none in one part to a maximum of three in the principal arraignment part, if all feeder pens are utilized for pre-arraignment detainees. The capacity of the feeder pen area is 24 arrestees. In Kings County, the principal arraignment part has two interview booths and an interview-area holding capacity of 10. In the Bronx, the principal arraignment part has 3 interview stations and an interview-area holding capacity of 25. The second Bronx arraignment part has 2 interview booths and a holding capacity of 20. In Queens County there are, as yet, no interview facilities in the arraignment part and a ten person holding capacity. In Queens, interviews are conducted through a 3 foot wide call door. With respect to each court in each county, arrestees are segregated into the following groups: male adults, male youths, females, and (in New York County) homosexuals. Segregation requirements reduce the maximum capacity of the holding areas and the available interview areas.

56. In general, The Society assigns 3 or 4 staff attorneys to be present in each arraignment session to accept court assignments with the exception of the overnight ("lobster") shift in New York County and the weeknight shifts in Queens County, which each have two attorneys, and the weekday shifts in Queens County, which has two staff attorneys and a supervisor. In addition to these attorneys, there are one or more 18–B attorneys also present in each arraignment session to accept assignments. In the Bronx and Queens, The Society assigns supervisors to supervise staff attorneys as well as accept court assignments. In Kings County, supervisors are assigned on a rotating basis to the day shift from 8:30 a.m. to 10:00 a.m. In New York County, supervisors are present during the day, night and overnight shifts.

57. At the present time, The Legal Aid Society does not provide staff attorneys to accept court assignments in up to five daytime arraignment parts each week in New York, Bronx, and Kings Counties. Since April 1986, The Society did not provide staff attorneys in three of the seven overnight shifts each week in New York County, but beginning on October 31, 1986, it resumed providing staff attorneys to all overnight shifts each week. The parts for which The Society does not provide attorneys are staffed exclusively by 18–B attorneys.

58. Of the arrestees who are not represented by privately retained counsel, The Legal Aid Society currently represents approximately 70% of arrestees at their arraignment and 18–B lawyers represent approximately 30% of arrestees at their arraignment.

59. Once The Society is provided a copy of an arrestee's court papers, The Society prepares a file. When the arrestee is produced in the detention interview area, one of its attorneys interviews the arrestee at a pace determined by The Society and, to the extent feasible, in the order of arrest. Where appropriate, the attorney seeks to determine as much information as necessary about the case, criminal history, and bail data. The activities of The Legal Aid attorney and the client are subject to the attorney-client privilege. The attorney prepares the case sufficiently (a) to advise the arrestee regarding any disposition offered at the arraignment and the advisability of testifying before the Grand Jury pursuant

to CPL 190.50 and (b) to respond to any request for bail made by the district attorney and (c) to determine the need to commence an investigation immediately upon conclusion of the arraignment session.

60. The Legal Aid Society does not keep records which measure the elapsed period between the time the arrestee and his court papers are available to The Society and the time his attorney has completed arraignment preparation and indicated to the court that the case is ready for arraignment. However, in Kings County this period of time is estimated at being 20 minutes. In New York County, the court keeps such statistics. For the period of October 13 through October 19, the time between The Legal Aid Society's receiving the defense copy of the court papers and notice that the arrestee was available for interview to the time that The Legal Aid Society's attorneys indicated that the case was ready for arraignment was a median time of 0.8 hours and an average time ranging from 1.3 to 2.3 hours. (See OCA arrest to arraignment time study for the days 10/13/86 through 10/20/86 attached hereto as Exhibit 7.) These figures do not reflect the number of cases that The Legal Aid Society in fact arraigns per hour; they reflect only the median and average elapsed time that The Society's attorneys take to complete the prearraignment work without regard to the volume of work done. For example, court records reflect that anywhere from 40 to 100 cases will be arraigned in an arraignment session.

61. When The Legal Aid Society lawyer finishes interviewing the arrestee and taking whatever other investigatory steps he believes to be necessary, the case is ready for arraignment. The court clerk thereafter calls the case for arraignment.

62. Assistant district attorneys participate in arraignments, negotiate and strike plea bargains, and make specific recommendations on bail.

63. The actual arraignment typically takes between five to ten minutes, even including the large number of cases that reach final disposition. In some arraignment sessions, the cases of more than 100 arrestees are processed, while in other sessions, the cases of as few as 30 to 40 persons are processed.

64. If a judge does not reach all the cases ready during a shift, calendared cases are postponed from session to session.

65. The average elapsed time between arrest and arraignment for defendants in September in Manhattan was about 34 hours, up from about 28 hours in July; in Brooklyn, about 48 hours, up from about 39 hours; in the Bronx, about 53 hours, up from about 26 hours; and in Queens, about 28 hours, up from about 24 hours. (See compilation of total arrests and average arrest-to-arraignment time, graph depicting percentage of arrestees arraigned within a given time, and compilation and graph of percentage of arrestees not arraigned within a given time, attached hereto, respectively as Exhibits 8, 9, and 10.)

66. During this same period, police processing time increased by an average of no more than three hours. (See Paragraph 14, above.)

67. In July 1986, a total of 2,240 new police officers graduated from the New York City Police Academy.

68. With respect to misdemeanor arrests, for the four counties affected by this action, between October 13 and October 19, 1986, the average arrest to central booking time was 4.47 hours, the average central booking rap sheet return was 12.33 hours and the average arrest to arraignment time was 34.85 hours. See Exhibit 6, attached hereto.

69. In September 1986, there were 20,-146 arrests in the City of New York, compared to 16,334 arrests for September 1985. In October 1986, there were at least 21,349 arrests, compared to 17,689 arrests for October 1985.

70. New York City Criminal Court Administrative Judge Robert Keating has made, and continues to make, extra arraignment parts available. Currently about one-third of all criminal court judge hours are spent on the arraignment parts.

71. Twenty more civil court judges are being transferred to act as criminal court judges to handle the work of the Criminal Court and the Supreme Court, Criminal Term. The City undertook an emergency construction effort to provide court space for these judges and in less than two months has provided fifteen courtrooms and support facilities. Five more courtrooms will be finished soon.

72. None of the additional court space described in subparagraph (b) of this paragraph is being used for arraignment purposes. Prosecutors and defense counsel to staff those courtrooms are not yet available. The City of New York authorized The Legal Aid Society and the City's district attorneys to hire more attorneys beginning in the week of October 14, 1986. The City has authorized The Legal Aid Society to hire forty new attorneys. These attorneys will not be able to start until at least December, 1986, due to the need to locate, hire, and provide them with sufficient training. The judges for the new courts, all of whom have been transferred from civil court, are only assigned until the beginning of January, 1987.