845 F.2d 374
 56 USLW 2620
 John WILLIAMS, Leonard Altman, Anthony Richards, Charles
Lewis, individually and on behalf of all others
similarly situated, Plaintiffs-Appellees,
v.
Benjamin WARD, in his official capacity as Police
Commissioner of the City of New York; New York City Police
Department; Richard J. Koehler, in his official capacity as
Commissioner of Correction of the City of New York; New
York City Department of Correction; Edward I. Koch, in his
official capacity as Mayor of the City of New York; the
City of New York, Defendants-Appellants.
 No. 1662, Docket 87-7572.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 10, 1987.
Decided April 19, 1988.
As Amended April 26, 1988.
 
 Jeffrey E. Glen, New York City (Peter L. Zimroth, Corp. Counsel of the City of New York, New York City, Terrence R. Real, Dynda Andrews, of counsel), for defendants-appellants.
 Steven G. Asin, New York City (Caesar D. Cirigliano, Attorney-in-Charge, Criminal Defense Div., The Legal Aid Soc., New York City, Ivar Goldart, of counsel), for plaintiffs-appellees.
 Before WINTER and MAHONEY, Circuit Judges, and STEWART,* District Judge.
 WINTER, Circuit Judge:
 
 
 1
 Under current procedures in New York City, a person who is arrested without a warrant first appears before a judicial officer at an arraignment in the City's Criminal Court. At that arraignment, the arrestee is afforded counsel, a probable-cause determination is made, pretrial release conditions are set, plea bargains are often struck, and charges may be dropped. Over one-third of such arrestees have their cases finally disposed of at arraignment. The rub is that arrestees must often sit in jail for more than two days before the arraignment. The plaintiffs in this case challenge the length of such detention, arguing that a prompt probable-cause determination should be made after each arrest.
 
 
 2
 Appellees brought this class action under 42 U.S.C. Sec. 1983 (1982) on behalf of themselves and all persons in the boroughs of Manhattan, the Bronx, Brooklyn and Queens who are arrested without warrants and who are detained by the City without a probable-cause determination by a judicial officer. Appellees sought a declaration that the length of time that class members are detained before probable cause is determined constitutes a violation of the fourth and fourteenth amendments to the Constitution as interpreted in Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Appellees also requested an injunction directing appellants to conduct probable-cause hearings promptly after completion of the necessary "administrative steps incident to arrest," id. at 114, 95 S.Ct. at 863, and to refrain from engaging in practices that delay completion of such administrative steps. After conducting a trial on stipulated facts, Judge Motley held that detention of class members beyond a period of twenty-four hours violated their constitutional rights. Williams v. Ward, 671 F.Supp. 225, 226 (S.D.N.Y.1987). The district court accordingly enjoined appellants, "except in exceptional circumstances," "from taking more than seven hours to complete steps necessary and incident to the arrest of plaintiffs and members of their class." The district court also enjoined appellants, "except in exceptional circumstances," "from holding in their custody any plaintiff or member of their class beyond a twenty-four period without a probable cause determination before a state judge." Because we disagree with the district court's interpretation of the relevant Supreme Court cases, we reverse.
 
 FACTUAL BACKGROUND
 
 3
 According to the parties' Stipulated Statement of Facts, 671 F.Supp. at 228-36, in "virtually all" criminal cases in New York City, suspects who are arrested without warrants receive a probable-cause hearing before a judicial officer only at their arraignment before a "local criminal court" pursuant to N.Y.Crim.Proc.Law Sec. 110.10(2)(a) (McKinney 1981). In New York City, the "local criminal court" in which arraignments are conducted is the Criminal Court of the City of New York, see id. Sec. 10.10(3)(b); N.Y.City Crim.Ct.Act Sec. 41 (McKinney Supp.1987), which is part of the "unified court system" of the State of New York. See N.Y. Const. art. 6, Sec. 1. The Criminal Court is supervised by the administrative board of the state judicial conference, which consists of the chief judge of the New York Court of Appeals and the presiding judges of the state's four Appellate Divisions. The New York State Legislature and the state's Office of Court Administration determine both the number and assignment of judges in the Criminal Court and provide for the cost of operating the courts. Id. art. 6, Secs. 28, 29. The City provides and pays for the maintenance and operation of courthouses and their physical plants. The Mayor of the City of New York appoints individuals to Criminal Court judgeships but has no power over the number of such judgeships.
 
 
 4
 The process by which arrestees presently make their way from the streets of New York to an arraignment courtroom is long and complex. The details of this process, however, are not in dispute. The parties agree that, in general, the initial eleven to fifteen hours after a warrantless arrest are consumed by police functions that include searching and securing the arrestee and ultimately transporting him to the central "booking" facility for the county in which the arrest was made. The New York City Police Department maintains these facilities, which are open twenty-four hours each day, in New York, Bronx, Kings and Queens Counties. The booking facilities in Queens and Bronx Counties are located in the courthouses of those counties; in New York and Kings Counties, however, the facilities are located approximately one-half mile from their respective courthouses.
 
 
 5
 Upon making a warrantless arrest, a New York City police officer first conducts a frisk search of the arrestee at the scene of the arrest. The officer then transports the arrestee to the officer's precinct stationhouse and later to a central booking facility. Occasionally, an officer may transport the arrestee directly to the booking facility. In the vast majority of cases, however, the police search and secure the arrestee at a precinct stationhouse, where the arresting officer reviews the arrest with a supervising police official to determine the appropriateness of the arrest, the charges to be filed and the need for additional investigation. The arresting officer also prepares a complaint arrest report, a property voucher form, and other forms that may be needed. In addition, the officer completes a handwritten copy of an "On Line Booking System" ("OLBS") arrest report either at the precinct or at the central booking facility.
 
 
 6
 According to police regulations, if the time necessary to complete these procedures is expected to exceed two hours, the police must take the arrestee's fingerprints at the precinct. Under such circumstances, the regulations require that the fingerprints be transported by automobile to the appropriate central booking facility, prior to the arrival of the arrestee, for electronic transmission to the New York State Division of Criminal Justice Services ("DCJS"). In turn, DCJS uses the fingerprints to retrieve the arrestee's prior criminal record, if any. Despite the regulations, however, an arrestee's paperwork and fingerprints are usually not taken to a central booking facility until the arrestee is taken there. On average, the arrestee arrives at a central booking facility four to six hours after arrest.
 
 
 7
 Once an arrestee is taken to a central booking facility, the police photograph the arrestee, take the arrestee's fingerprints (if not already taken), search and secure the arrestee, and conduct further supervisory review of the charges to be brought against him. In addition, the police enter information from the OLBS arrest report into a computer (with the arresting officer present for consultation) and electronically transmit fingerprints and other identification data to DCJS to obtain the suspect's "rap sheet," consisting of his criminal record and outstanding warrants. In general, the processing of arrestees at central booking facilities takes between one and two hours. Once the arresting officer has completed his duties at the central booking facility, the officer proceeds immediately (without waiting for the return of a rap sheet from DCJS) to the district attorney's Early Case Assessment Bureau (commonly known as the "complaint room"), where the officer is interviewed in order to assist in the preparation of an accusatory instrument.
 
 
 8
 In New York, Kings and Bronx Counties, fingerprints and other information are transmitted to DCJS by laser facsimile equipment and are received in Albany within thirty seconds of transmission.[1] In Queens, the police use "datalog" equipment that is capable of providing fingerprints and other information to DCJS in either nine or fourteen minutes, depending on the type of datalog equipment used. Although laser transmission is faster, datalog transmission provides better resolution. Regardless of the method of transmission used, however, the pace at which transmissions to DCJS are made and rap sheets are returned depends on the number of police personnel available to take fingerprints, the number of police and DCJS machines available to transmit and to receive fingerprints and other information, the number of persons available to operate such machines, and the amount of equipment available to transmit and receive rap sheets. In addition, delays may occur if the quality of the fingerprints, or of their electronically reproduced images, is poor. DCJS informs the police that a fingerprint is not readable within minutes after the prints are received and read by DCJS personnel. Once DCJS receives a readable set of prints, the police receive "rap sheets" in an average of three hours.
 
 
 9
 Along with a criminal history of the arrestee, a rap sheet contains both a list of outstanding warrants and a list of alleged aliases. Because information received from DCJS is often incomplete or dated, the police confirm the warrants and aliases received from DCJS by comparing this information with records of the New York State Office of Court Administration. This confirmation procedure takes approximately one hour. Once warrants and aliases are confirmed, a police messenger delivers copies of the rap sheet and the OLBS arrest report to the complaint room. Meanwhile, the arrestee is interviewed at the central booking facility by Criminal Justice Agency ("CJA") employees. They use material from interviews and rap sheets to assess applications for pretrial release and to determine whether the arrestee is eligible for release at the arraignment hearing.
 
 
 10
 Although New York law is silent on the participation of district attorneys in the preparation of accusatory instruments (and in many counties outside New York City they are prepared by local police officials), in the vast majority of cases in New York City accusatory instruments are prepared by the district attorneys who work in the complaint room. In addition, prosecutors perform a variety of other functions in the complaint room. The district attorneys assess the charges against arrestees by interviewing the arresting officer and other relevant persons. The district attorneys decide whether cases should be sent to a grand jury and prepare various notices required by New York's Criminal Procedure Law, such as notices of requests for alibi witnesses; notices of statements, physical evidence and identification; and notices of intent to present the case to a grand jury. Finally, based upon an evaluation of available evidence, the district attorneys assess the strength of cases. For example, prosecutors in the complaint room often determine acceptable pleas. Alternatively, if a district attorney finds that there is an insufficient basis for a prosecution, he will decline to prosecute and will direct that the arrestee be released. On the other hand, if the district attorney elects to prosecute, a complaint and other notices are typed, and the arresting officer attests to the complaint.
 
 
 11
 When the sworn complaint, rap sheet and CJA report for a given arrestee finally become available, the police department usually assembles four copies for distribution to the court, defense counsel, prosecutors and police. These documents are subsequently delivered to the docket room of the Criminal Court. In New York County, where the docket room never closes, the Criminal Court will not accept an arrestee's papers until the arrestee himself arrives at the courthouse. This policy is intended to facilitate the coordination of an arrestee's arrival at the arraignment court with delivery of the documents pertaining to his case. The policy nevertheless may foster some delay, because detention space in New York City courthouses is limited.[2] In Kings, Queens and Bronx Counties, where the docket rooms are closed between 1 a.m. and 8 a.m. each morning, the police deliver an arrestee's papers to the appropriate docket room regardless of whether the arrestee has arrived at the courthouse. Consequently, in those counties, the production of arrestees in the courtroom may not always be coordinated with the delivery of their papers.
 
 
 12
 Once an arrestee's papers are filed in the docket room, clerks of the Criminal Court assign an arraignment docket number to the case and place the case on an arraignment part calendar. Although this calendar serves a recordkeeping function, it is generally not used by the court to call cases or to determine the order in which persons are arraigned. Once a case receives a docket number, a clerk from the docket room delivers the paperwork concerning the case to the courtroom. A police official then directs that an officer transport the arrestee from a precinct, central booking facility or courthouse detention facility, as the case may be, to "feeder pens" located behind the courtroom in which the arraignment is to be conducted. On the way to the feeder pens, the police take official photographs ("mug shots") of arrestees accused of felonies or certain misdemeanors. As is true each time that custody of the arrestee is transferred among police officers or between the police and the Department of Correction (which operates the courthouse detention facilities), ledger entries record the transfer of arrestees to the feeder pens.
 
 
 13
 As of September 1986, there were five daily arraignment sessions ("parts") in New York County. Three of these arraignment parts, including a part reserved primarily for alleged misdemeanants who have been issued desk appearance tickets, were scheduled for the day shift. The evening shift and the night ("lobster") shift were each allotted one arraignment part, and additional parts were conducted when the need arose. In Queens and the Bronx, the Criminal Court conducted two parts during the day, two during the evening and additional parts when necessary. In Brooklyn, the court conducted three parts on weekdays (two during the day and one in the evening) and two (day and evening) on Saturday and Sunday. Arraignment parts were thus held every day of the year, and in New York County there was at least one part open during every hour of each day. In Bronx, Kings and Queens Counties, however, there were no arraignment parts during the lobster shift, which runs approximately from 1 a.m. to 9 a.m.
 
 
 14
 Once the arrestee is placed in a feeder pen adjacent to the arraignment courtroom and his court papers are delivered to the courtroom, the arrestee becomes available for an interview with defense counsel. Under N.Y.Crim.Proc.Law Sec. 170.10(3) (McKinney 1982), an arrestee has a right to the assistance of counsel at his arraignment. Moreover, under N.Y. County Law Secs. 722, 722-b (McKinney Supp.1988), the City of New York is responsible for providing counsel for persons who are charged with crimes in the City but who cannot afford a lawyer. At the arraignment, the Criminal Court assigns either The Legal Aid Society, under the terms of a contract between the Society and the City, or private counsel under terms set forth in Section 722-b, to represent indigent defendants. In practice, however, appointed counsel represent arrestees who are not indigent, because the court generally does not undertake a determination of an arrestee's indigency before conducting an arraignment. The Legal Aid Society represents seventy percent of the arrestees who are not represented by privately retained counsel.[3]
 
 
 15
 After The Legal Aid Society receives a copy of an arrestee's papers, the Society begins to prepare a file on the case.[4] A Legal Aid Society lawyer interviews the arrestee after the arrestee arrives in the feeder pen adjacent to the courtroom. At the interview, defense counsel attempts to elicit as much information as is necessary about the arrestee's case, his criminal history and his eligibility for bail. The Legal Aid lawyer prepares the case to the extent necessary to allow him (1) to advise the arrestee on the desirability of any disposition offered at the arraignment, (2) to advise the arrestee on the possibility of testifying before a grand jury under N.Y.Crim.Proc.Law Sec. 190.50(5) (McKinney 1982), (3) to respond to any request for bail made by the district attorney, and (4) to assess the need for any further investigation after arraignment. Although The Legal Aid Society does not maintain records of the time that its lawyers take to prepare a case for arraignment, the parties have agreed that, in Kings County, a good estimate of an average figure would be twenty minutes. Statistics produced by the Criminal Court indicate that, in New York County, during a sample period between October 13 and October 19, 1986, the daily average time elapsing between (1) Legal Aid's receipt both of an arrestee's court papers and of notice that the arrestee was available for interview, and (2) Legal Aid's announcement that the case was ready for arraignment, ranged from approximately 78 minutes to 138 minutes. The median time, however, was only forty-eight minutes.[5]
 
 
 16
 A case is ready for arraignment and is called by the court clerk after the Legal Aid lawyer finishes interviewing his client and taking whatever other investigatory steps may be necessary. Assistant district attorneys negotiate and strike plea bargains and make bail recommendations at arraignments. More than a third of the arrestees have their cases finally disposed of at arraignment.
 
 
 17
 The typical arraignment, including those at which a final disposition is reached, takes between five and ten minutes, and the Criminal Court may process as few as thirty or as many as one hundred cases in a single session. Cases listed on an arraignment part calendar may be postponed until another session if the cases are not ready for arraignment during the shift. Statistical summaries of arraignment times for selected periods are set forth in Appendices A and B.
 
 PROCEDURAL HISTORY
 
 18
 Plaintiffs' original complaint was filed at approximately 11:00 a.m. on February 7, 1985. Named as defendants were the City of New York, its police department, police commissioner, department of correction, commissioner of correction and mayor. The complaint alleged that plaintiff Charles Lewis had been arrested by New York City police at 1:00 a.m., and plaintiffs John Williams, Leonard Altman and Anthony Richards at 1:15 a.m., on February 6, 1985 in New York County. Plaintiffs alleged that they remained in custody at the time that the complaint was filed,[6] and had not been afforded a probable-cause determination before a judicial officer. They sought relief on their own behalf and on behalf of a class of all persons arrested in New York County. Plaintiffs also alleged that, between January 1, 1984 and January 31, 1985, the monthly average period of time during which persons arrested without a warrant in New York County were held before arraignment ranged from a low of twenty-six hours in August 1984 to a high of fifty hours in May 1984.
 
 
 19
 Defendants did not immediately answer the complaint. Instead, they informed plaintiffs that they would attempt to satisfy plaintiffs' claims by reducing arrest-to-arraignment times.[7] Defendants asserted that their ability to accomplish this goal would be enhanced if they were not required to respond to the complaint. Plaintiffs accordingly agreed to a series of court-ordered stipulations proposed by defendants that incorporated defendants' assurances and extended their time to respond to the complaint and to the accompanying motion for class certification. After arrest-to-arraignment times dropped during the spring of 1985, the district court on May 31, 1985 placed the case on its suspense calendar. There the case remained for the following sixteen months.
 
 
 20
 After a period during which arrest-to-arraignment times increased, plaintiffs on October 3, 1986 restored the litigation to active status by filing an amended complaint. The amended complaint sought relief for an expanded class that included persons arrested in Bronx, Kings and Queens Counties, as well as those arrested in New York County. In addition, plaintiffs sought both a temporary restraining order requiring that probable-cause hearings be held within thirty-six hours of all warrantless arrests and a preliminary injunction requiring such hearings within twenty-four hours of arrest. Judge Sweet on October 3 denied the motion for a temporary restraining order and referred the motion for a preliminary injunction to Judge Motley. In addition to opposing the motion for a preliminary injunction, defendants filed a cross-motion for an order joining as necessary parties the New York State Office of Court Administration, the New York State Division of Criminal Justice Services, the District Attorneys for New York, Kings, Queens and Bronx Counties, and The Legal Aid Society.
 
 
 21
 At a hearing held on October 17, 1987, the district court denied defendants' joinder motions. The court also determined that the parties disputed few, if any, material facts. The court accordingly consolidated the trial with the hearing on plaintiffs' motion for a preliminary injunction. The parties subsequently submitted trial memoranda and a stipulated statement of facts in lieu of trial. On February 20, 1987, plaintiffs requested expedited consideration of the case. Although defendants did not oppose this motion, they nevertheless urged the district court to reconsider their joinder motion, arguing that "at the very least" the state courts must be joined in order to afford the relief sought by plaintiffs.
 
 
 22
 The district court agreed to reconsider defendants' joinder motion and held a hearing on July 2 to decide whether the joinder motion should be granted in lieu of its entering final judgment. At the conclusion of this hearing, the district court once again denied defendants' joinder motion and issued both a declaratory judgment and an injunction that prohibited defendants from detaining members of the plaintiff class for more than twenty-four hours without probable-cause determinations by state judges and from taking more than seven hours to complete the steps necessary and incident to arrest.[8] This appeal followed.[9]
 
 DISCUSSION
 
 23
 It must be emphasized at the outset that the stipulated facts in no way prove that the defendants named are either responsible for inordinate delay in processing arrestees or legally able to provide the probable-cause determinations requested for the plaintiff class.
 
 
 24
 So far as delay is concerned, the stipulated facts amply describe the various steps that follow an arrest and culminate in arraignment but provide little illumination as to the bottlenecks that delay arraignments for days in some cases. We may take judicial notice that traffic conditions in New York City may preclude any system requiring transportation of arrestees or documents to operate "promptly." We also note that the sheer volume of arrests, well over 200,000 annually, guarantees enormous problems in coordinating the numerous actors and actions necessary to each arraignment. Moreover, because these actors include numerous nondefendants such as the various district attorney's offices, the state courts, the DCJS, and The Legal Aid Society itself, any claim that the named defendants either cause, or are able to eliminate, all delays in arraignment must be rejected. For example, one source of delay identified in the record is the refusal of the state criminal court in New York County to accept papers for an arrestee until the arrestee is in the building. None of the defendants has the power to modify that policy. Another source of delay in some cases may be the time taken by assigned attorneys, including those from The Legal Aid Society, who represent the plaintiff class in this matter, to prepare cases. See supra note 5.
 
 
 25
 Finally, the named defendants are not judicial officers and cannot provide the requested probable-cause determinations. Such determinations must currently be made by state courts. See N.Y.Crim.Proc.Law Secs. 100.40, 140.20, 140.45 (McKinney Supp.1988). Because defendants have custody of the members of the class, however, they are in a position to release them and thus have the power to grant one of the two alternatives ordered by the district court. We emphasize this in order to dispel any belief that this action has a factual basis other than the length of time some arrestees are detained or involves a legal claim other than the facial claim that the Constitution imposes an absolute temporal limit of twenty-four hours on such detentions absent a probable-cause determination.
 
 
 26
 We do note that the district court made certain conclusory findings. The finding that the time between arrest and arraignment usually exceeds twenty-four hours is not challenged. Other findings, however, included statements that the steps "necessary" to an arrest "should" not take more than six or seven hours and that twenty-four hours is "sufficient" to complete all steps necessary for an arraignment. Although couched as factual findings, these statements are actually legal conclusions as to how much time is reasonable as a matter of law to carry out particular phases of the arrest-to-arraignment process. For example, the record does not detail what resources--for example, police personnel, vehicles, judges, lawyers, court personnel--are presently available to complete all the steps necessary for either probable-cause determinations or arraignments. The district court's conclusions, therefore, are not that, given present resources, arraignments can reasonably take place within twenty-four hours. Instead, those conclusions are that whatever resources are presently available, arraignments must as a matter of law occur within that period of time. The outcome of this case thus turns largely upon what, if any, absolute temporal limits are imposed by the Constitution on detentions before a judicial probable-cause determination is made.
 
 
 27
 Relying on language in Gerstein v. Pugh, 420 U.S. at 113-14, 95 S.Ct. at 862-63, plaintiffs contend that defendants are violating the fourth and fourteenth amendments by detaining class members beyond "a brief period of detention to take the administrative steps incident to arrest" in the absence of a judicial probable-cause determination. Gerstein involved a constitutional challenge to Florida procedures under which criminal defendants charged by a prosecutor's information might be detained for extended periods. Under those procedures, "[t]he only possible methods for obtaining a judicial determination of probable cause were a special statute allowing a preliminary hearing after 30 days, Fla.Stat.Ann. Sec. 907.045 (1973), and arraignment, which ... was often delayed a month or more after arrest." Id. at 106, 95 S.Ct. at 859 (citing Pugh v. Rainwater, 332 F.Supp. 1107, 1110 (S.D.Fla.1971)) (footnote omitted). The Supreme Court concluded that the Florida procedures were unconstitutional. The Court observed that:
 
 
 28
 [A] policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest. Once the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate. There no longer is any danger that the suspect will escape or commit further crimes while the police submit their evidence to a magistrate. And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly. The consequences of prolonged detention may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the subject's job, interrupt his source of income, and impair his family relationships.... When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty.
 
 
 29
 Id. 420 U.S. at 113-14, 95 S.Ct. at 863. The Court accordingly held that "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." Id. at 114, 95 S.Ct. at 863.
 
 
 30
 Gerstein explicitly rejected the view that "the determination of probable cause must be accompanied by the full panoply of adversary safeguards--counsel, confrontation, cross-examination, and compulsory process for witnesses." Id. at 119, 95 S.Ct. at 866. In particular, the Court stated that an elaborate and adversarial "preliminary hearing" was not essential to determine probable cause under the fourth amendment. The Court noted that probable cause "traditionally has been decided by a magistrate in a nonadversary proceeding on hearsay and written testimony," id. at 120, 95 S.Ct. at 866, and that the addition of "formalities and safeguards designed for trial" would be of only "slight" value in enhancing the reliability of probable-cause determinations. Id. at 122, 95 S.Ct. at 867. The Court also observed that the addition of complex procedures to such traditional probable-cause hearings would "diminish[ ]" "the likelihood that [the hearing] can be held promptly after arrest." Id. at 120, 95 S.Ct. at 866. Accordingly, the Court concluded that the Constitution does not require states to conduct adversarial determinations of probable cause.
 
 
 31
 The Gerstein Court also emphasized that the Constitution does not mandate a uniform system of pretrial criminal procedure. Recognizing that "state systems of criminal procedure vary widely," the Court explained that:
 
 
 32
 There is no single preferred pretrial procedure, and the nature of the probable cause determination usually will be shaped to accord with a State's pretrial procedure viewed as a whole. While we limit our holding to the precise requirement of the Fourth Amendment, we recognize the desirability of flexibility and experimentation by the States. It may be found desirable, for example, to make the probable cause determination at the suspect's first appearance before a judicial officer, see McNabb v. United States, 318 U.S. 342-44 [63 S.Ct. 608, 613-14, 87 L.Ed. 819 (1943) ], or the determination may be incorporated into the procedure for setting bail or fixing other conditions of pretrial release.... Whatever procedure a State may adopt, it must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest.
 
 
 33
 Id. 420 U.S. at 123-25, 95 S.Ct. at 868-69.
 
 
 34
 Gerstein "did not ... mandate a specific timetable" for probable-cause determinations. Schall v. Martin, 467 U.S. 253, 275, 104 S.Ct. 2403, 2415, 81 L.Ed.2d 207 (1984). And although both the district court and the court of appeals in Gerstein held that constitutional requirements were satisfied by procedures requiring probable cause to be determined within ninety-six hours (four days) of a warrantless arrest,[10] the Supreme Court did not address the constitutionality of the procedures adopted by the lower courts.[11] Nevertheless, the Court's discussion in Gerstein of the need for "flexibility and experimentation by the States" and its express approval of incorporating probable-cause hearings into procedures for determining pretrial release conditions provide us with some indication of the range of constitutionally acceptable procedures. In addition, the Court cited, with apparent approval, a tentative draft of the American Law Institute's Model Code of Pre-Arraignment Procedure. See 420 U.S. at 124 n. 25, 95 S.Ct. at 868 n. 25. Under this draft Model Code, a person arrested without a warrant would be entitled to a first appearance before a judicial officer within twenty-four hours of arrest. Model Code of Pre-Arraignment Procedure Sec. 310.1(1) (Tent. Draft No. 5, 1972). At the first appearance, the state would be required to support the arrest with a reasonably detailed written statement of facts, and the magistrate would be authorized but not required to make a determination of probable cause. Model Code of Pre-Arraignment Procedure Sec. 310.1(6) (Tent. Draft No. 5A, 1973). In most cases, probable cause would be determined at an "adjourned session" to be held within forty-eight hours of the first appearance. Id. Sec. 310.2(2).[12]
 
 
 35
 In Schall v. Martin, the Court shed additional light on the range of constitutionally acceptable procedures. Schall involved a challenge to provisions of the New York Family Court Act authorizing preventive detention of accused juvenile delinquents. Under the Family Court Act, a juvenile who is not issued an "appearance ticket" and released to the custody of his parents is generally entitled to an initial appearance before the Family Court immediately after arrest. See Schall, 467 U.S. at 257-58 n. 5, 104 S.Ct. at 2406 n. 5; N.Y.Fam.Ct.Act Sec. 305.2(4)(b) (McKinney Supp.1988). The Family Court judge, however, is not required to determine probable cause at the initial appearance. See 467 U.S. at 276, 104 S.Ct. at 2416. Instead, probable cause under the Family Court Act is usually determined at a formal adversarial hearing that is ordinarily conducted within three days of the initial appearance. See 467 U.S. at 277, 104 S.Ct. at 2416; N.Y.Fam.Ct.Act Secs. 325.1-.3 (McKinney 1983).[13] The Court upheld each of these procedures. The Court concluded that the Constitution did not require the Family Court to make a finding of probable cause at the initial appearance. In addition, the Court held that the "flexible procedures" used to determine probable cause under the Family Court Act were "constitutionally adequate" under the fourth amendment as interpreted in Gerstein. 467 U.S. at 277, 104 S.Ct. at 2417. Indeed, the Court observed that "[t]he brief delay in the probable-cause hearing may actually work to the advantage of the juvenile, since it gives his counsel ... time to prepare." Id. at n. 28.[14]
 
 
 36
 Drawing upon the reference in Gerstein to "a brief period of detention to take the administrative steps incident to arrest," 420 U.S. at 114, 95 S.Ct. at 863, plaintiffs contend that an arrestee is constitutionally entitled to a probable-cause hearing as soon as would be reasonably possible under conditions that are assumed to be relatively ideal. The caselaw simply does not support this rule. Gerstein itself stressed the need for flexibility and expressly stated that a probable-cause determination might be made at the first appearance before a judicial officer or incorporated into procedures for pretrial release. Id. at 123-25, 95 S.Ct. at 867-68. That alone is a dispositive statement that completion of the "administrative steps incident to arrest" does not trigger a right to an immediate probable-cause hearing in light of the fact that numerous other steps are necessary to complete the pretrial release procedures into which the probable-cause determinations may be merged. The ALI procedures referred to in Gerstein, moreover, do not require a probable-cause determination at the first appearance. See supra note 12. Finally, Schall expressly approved the possibility that, since probable cause need not be found at the initial appearance under the Family Court Act, a probable-cause hearing might be delayed until three (and sometimes six) days after the initial appearance.
 
 
 37
 The district court, of course, did not order defendants to provide probable-cause hearings immediately after completion of the "administrative steps incident to arrest." Nevertheless, the district court's imposition of a strict twenty-four-hour limit on prearraignment detention is a fortiori inconsistent with Gerstein and Schall, both of which clearly accept as constitutional the possibility of two or three days of detention before probable cause alone is determined. Schall in fact contains an isolated but unqualified suggestion that a delay of five days would be permissible solely for a probable-cause determination. See supra note 14. Moreover, in holding that probable-cause hearings need not be adversarial, Gerstein recognized that the utilization of more elaborate procedures reduces the likelihood that probable cause could be assessed immediately after arrest. See Gerstein, 420 U.S. at 120, 95 S.Ct. at 866. The Court also recognized that states might employ procedures that are more complex than the minimum ex parte hearing described in Gerstein, and that states may wish to combine probable-cause hearings with procedures for fixing the terms of pretrial release. See id. at 124, 95 S.Ct. at 868; cf. Schall, 467 U.S. at 260, 277, 104 S.Ct. at 2407, 2416; (probable cause under Family Court Act may be determined at preventive detention "factfinding" hearing). In addition, by endorsing the procedures of the ALI Model Code, the Court recognized that states could constitutionally choose to employ adversarial procedures, albeit two "court days" after arrest, to determine probable cause. See Gerstein, 420 U.S. at 124 n. 25, 95 S.Ct. at 868 n. 25. Similarly, in Schall, the Court expressly upheld procedures that entitled an accused juvenile "to a formal, adversarial probable cause hearing within three days of his initial appearance." Schall, 467 U.S. at 277, 104 S.Ct. at 2416.
 
 
 38
 The Supreme Court's endorsement of such a vast array of procedures, along with its recognition that additional procedures require additional time, indicate that the constitutional "promptness" of a probable-cause hearing must be determined in light of the totality of the processes afforded the defendant.[15] And although the relationship between procedures employed and prehearing delay does not admit of mathematical precision, we must nevertheless assess the procedures challenged in the instant case by comparing them with the procedures deemed acceptable in Gerstein and Schall.
 
 
 39
 New York's arraignment procedures do not provide arrestees with an opportunity to have probable cause determined with the "full panoply of adversary safeguards" described in Gerstein --"counsel, confrontation, cross-examination, and compulsory process for witnesses." Gerstein, 420 U.S. at 119, 95 S.Ct. at 866. Although an arraignment judge may examine the sufficiency of a complaint to determine whether probable cause exists,[16] the complaint need contain only a hearsay report of factual allegations rather than a report made by an actual witness of events described in the charging instrument. See N.Y.Crim.Proc.Law Sec. 70.10(2) (McKinney 1981) (except as otherwise provided, evidence of "reasonable cause" may "include or consist of hearsay"); N.Y.Crim.Proc. Law Sec. 100.40 (McKinney 1981) (informations, but not felony or misdemeanor complaints, must contain non-hearsay allegations establishing elements of offense). Thus, probable-cause determinations made at arraignments under the Criminal Procedure Law, unlike probable-cause determinations made under the Family Court Act, see Schall, 467 U.S. at 277, 104 S.Ct. at 2416; N.Y.Fam.Ct.Act Sec. 325.2(1) (McKinney 1983), do not involve live testimony and cross-examination. Indeed, the procedures for probable-cause hearings under the Family Court Act were derived from provisions of the Criminal Procedure Law that govern preliminary hearings, which are conducted after arraignment. See N.Y.Fam.Ct. Act Sec. 325.2 practice commentary (McKinney 1983); N.Y.Crim.Proc. Law Secs. 180.10(2), 180.60 (McKinney 1982).
 
 
 40
 Nevertheless, the use of arraignment procedures to determine probable cause provides members of the plaintiff class with benefits that would not be available if probable cause were determined through the use of minimal ex parte procedures immediately after completion of the "administrative steps incident to arrest." In particular, the accused is present at the arraignment and has the benefit of counsel in attacking the sufficiency of the charging instrument. More importantly, however, arraignments involve far more than probable-cause determinations. Before arraignment, prosecutors both review the appropriateness of the charge against an arrestee and make a recommendation with regard to the possibility of pretrial release. In addition, the arrestee, with the assistance of defense counsel, may negotiate a final disposition of the arrestee's case at the arraignment. Indeed, over one-third of all cases reach their final disposition at arraignment through dismissals, pleas of guilty, or adjournments in contemplation of dismissal.[17] In the other cases, the court may set bail or other conditions of pretrial release.
 
 
 41
 We believe that the procedural benefits provided to arrestees under New York City's arraignment system justify constitutionally arrest-to-arraignment periods of seventy-two hours in length. Our conclusion is based in part on the fact that the ALI draft Model Code procedures approved in Gerstein required probable cause to be determined at an "adjourned session" to be held within seventy-two hours of arrest. Like the New York arraignment procedures, the Model Code's procedures for "adjourned sessions" provide arrestees with both the right to counsel and the right to make a personal appearance. And although the Model Code allows live testimony at an adjourned session with the special permission of the court, the state's submission would usually be made through the use of affidavits containing hearsay. See Model Code of Pre-Arraignment Procedure Sec. 310.2(2) & note (1975); Model Code of Pre-Arraignment Procedure Sec. 310.4 (Tent.Draft No. 5, 1972). In addition, the judicial officer presiding at an adjourned session may set bail or other conditions for pretrial release. Given the similarities between the New York arraignment procedures and the ALI Model Code, any limitation on prearraignment detention of less than seventy-two hours cannot be sustained in the instant case.
 
 
 42
 Schall also supports our conclusion. Although plaintiffs emphasize that the New York arraignment procedures, unlike probable-cause hearings under the Family Court Act, do not involve the use of live testimony, it is commonly agreed that such testimony is rarely useful in determining probable cause. See Gerstein, 420 U.S. at 121-22, 95 S.Ct. at 866-67 ("[i]n most cases, ... [the] value [of confrontation and cross-examination] would be ... slight"); Model Code of Pre-Arraignment Procedure Sec. 310.2 note (1975) ("testimony at this stage is rarely important and imposes a burden on the witnesses"). Even if confrontation and cross-examination are useful in this context, arrestees at arraignments, like the juveniles in Schall, nevertheless possess the right to counsel--a right that is plainly far more valuable in challenging probable cause than is the right to confront and cross-examine witnesses. Moreover, New York City's arraignment system, unlike the probable-cause hearing under the Family Court Act, offers an arrestee an opportunity to obtain pretrial release or an early disposition of his case if probable cause is found. The present arraignment system therefore contains procedures that are at least as beneficial to arrestees as the procedures afforded juveniles in Schall.[18] Accordingly, Schall's acceptance of up to a seventy-two-hour period between an initial appearance and a probable-cause hearing under the Family Court Act reinforces, if not compels, our conclusion that prearraignment detention of seventy-two hours is constitutionally permissible in the instant case.
 
 
 43
 Finally, any attempt to insert the requested mandatory probable-cause hearing between arrest and arraignment will actually work enormous harm to the plaintiff class. Only a tiny fraction of that class would benefit from the Gerstein minimal ex parte hearing in light of the rather easily met requirements of probable cause. However, over 200,000 such hearings annually would be necessary, and because they would be held before the same judges who must thereafter conduct arraignments, the time between arrest and arraignment would be increased for all but those few who are released for lack of probable cause. The relief requested would thus actually lengthen detention periods for the vast majority of the class.[19]
 
 
 44
 We do not mean to suggest that prearraignment detentions of seventy-two hours are desirable. Our task is only to define the range of constitutionally acceptable arraignment times in light of Gerstein's recognition of "the desirability of flexibility and experimentation by the States." In contrast to the approach endorsed in Gerstein, the district court fastened upon defendants a procedural straightjacket that would be detrimental to the interests of the plaintiff class. Moreover, given the complexity of the arraignment process in New York City, we think that the district court's conclusion that defendants could obtain probable-cause hearings for all detainees within twenty-four hours of their arrest reflects an unrealistic view of the tasks facing New York City's criminal justice system. The district court's twenty-four-hour limit on arraignment times might perhaps be realistic if there were less crime and traffic in New York City, or if, as the district court actually suggested, the City's police did not "arrest so many and make the system so overworked,"[20] or if the City had more police, courthouse detention space, judges, prosecutors and Legal Aid lawyers.[21] Whether New York City can establish an ideal arraignment system is not the issue before us, however, for the Constitution does not compel it to do so.[22]
 
 
 45
 We emphasize again, however, that on this record this is not a case in which the causes of delay have been identified and can be eliminated by these defendants through reasonably feasible measures. Rather, the issue is whether detention absent a probable-cause hearing must cease after twenty-four hours no matter how costly eliminating all delay may be and no matter what the consequences are for controlling crime in New York City.
 
 
 46
 Reversed.
 
 APPENDIX A
 
 47
 PERCENTAGE OF ARRESTEES NOT ARRAIGNED WITHIN A GIVEN TIME, JANUARY SEPTEMBER
 
 1986
 BRONX COUNTY
 Hours After Arrest
 
 48
 Month 24 32 36 40
 
 
 49
 January 47.1 16.4 12.3 7.9
 
 
 50
 February 44.8 16.8 13.0 9.7
 
 
 51
 March 48.8 20.4 15.0 10.8
 
 
 52
 April 47.7 17.2 12.9 9.6
 
 
 53
 May 59.1 29.7 22.4 18.5
 
 
 54
 June 48.2 20.4 15.1 NA
 
 
 55
 July 49.6 18.2 12.5 NA
 
 
 56
 August 63.6 43.9 36.0 NA
 
 
 57
 September 94.7 75.0 66.6 NA
 
 KINGS COUNTY
 Hours After Arrest
 
 58
 Month 24 32 36 40
 
 
 59
 January 68.6 34.0 22.0 14.7
 
 
 60
 February 77.6 29.0 20.0 12.9
 
 
 61
 March 84.9 54.2 44.9 35.0
 
 
 62
 April 87.5 56.2 44.0 34.0
 
 
 63
 May 88.5 63.2 51.2 31.0
 
 
 64
 June 92.2 66.0 55.1 NA
 
 
 65
 July 85.7 64.8 55.1 NA
 
 
 66
 August 96.4 78.4 69.0 NA
 
 
 67
 September 97.5 77.9 69.1 NA
 
 NEW YORK COUNTY
 Hours After Arrest
 
 68
 Month 24 32 36 40
 
 
 69
 January 61.9 33.2 20.8 10.9
 
 
 70
 February 59.6 29.5 18.8 9.1
 
 
 71
 March 72.9 42.3 28.8 17.0
 
 
 72
 April 60.2 29.0 17.2 9.0
 
 
 73
 May 56.0 25.4 23.7 16.5
 
 
 74
 June 66.7 24.7 21.8 NA
 
 
 75
 July 61.5 31.0 21.3 NA
 
 
 76
 August 63.7 41.4 37.5 NA
 
 
 77
 September 80.4 54.2 41.4 NA
 
 QUEENS COUNTY
 Hours After Arrest
 
 78
 Month 24 32 36 40
 
 
 79
 January 30.6 7.5 6.0 4.0
 
 
 80
 February 26.1 8.9 5.0 4.6
 
 
 81
 March 42.4 14.6 9.6 6.1
 
 
 82
 April 34.9 11.5 7.1 4.8
 
 
 83
 May 43.7 16.9 10.7 6.6
 
 
 84
 June 40.2 13.9 9.2 NA
 
 
 85
 July 40.5 14.3 10.0 NA
 
 
 86
 August 51.7 22.9 17.5 NA
 
 
 87
 September 55.7 27.0 20.7 NA
 
 NA = Not Available
 APPENDIX B
 AVERAGE ARRAIGNMENT TIMES (IN HOURS)
 OCTOBER 13-19, 1986
 County
 
 88
 Day of Arrest Bronx Kings New York Queens
 
 
 89
 10/13 (M) 25.39 43.21 37.05 26.17
 
 
 90
 10/14 (T) 24.16 44.77 39.34 26.05
 
 
 91
 10/15 (W) 22.70 48.97 40.38 30.59
 
 
 92
 10/16 (Th) 22.94 52.63 42.34 31.16
 
 
 93
 10/17 (F) 26.05 58.91 50.62 26.76
 
 
 94
 10/18 (Sa) 20.91 53.72 51.30 26.81
 
 
 95
 10/19 (Su) 15.38 49.88 35.59 20.36
 
 FEBRUARY 2-15, 1987
 County
 
 96
 Day of Arrest Bronx Kings New York Oueens
 
 
 97
 02/02 (M) 32.77 37.79 28.61 22.15
 
 
 98
 02/03 (T) 40.37 49.57 36.86 24.28
 
 
 99
 02/04 (W) 48.91 59.59 43.16 26.28
 
 
 100
 02/05 (Th) 52.64 70.21 51.92 22.48
 
 
 101
 02/06 (F) 64.09 65.28 55.39 23.67
 
 
 102
 02/07 (Sa) 57.21 67.81 52.01 35.78
 
 
 103
 02/08 (Su) 53.59 68.48 40.44 34.71
 
 
 104
 02/09 (M) 43.04 60.81 32.95 22.86
 
 
 105
 02/10 (T) 37.50 66.98 38.76 24.01
 
 
 106
 02/11 (W) 45.47 70.72 44.21 29.48
 
 
 107
 02/12 (Th) 58.82 62.83 46.16 36.32
 
 
 108
 02/13 (F) 65.57 70.21 48.46 40.13
 
 
 109
 02/14 (Sa) 68.97 68.51 49.18 37.24
 
 
 110
 02/15 (Su) 58.26 64.38 42.83 36.27
 
 APRIL 19-25, 1987
 County
 
 111
 Day of Arrest Bronx Kings New York Queens
 
 
 112
 04/19 (Su) 50.80 32.90 31.20 20.53
 
 
 113
 04/20 (M) 42.50 28.93 24.74 21.48
 
 
 114
 04/21 (T) 45.56 27.58 30.84 21.91
 
 
 115
 04/22 (W) 45.48 27.68 37.25 23.70
 
 
 116
 04/23 (Th) 46.84 33.39 42.49 26.64
 
 
 117
 04/24 (F) 54.37 32.82 50.37 32.05
 
 
 118
 04/25 (Sa) 47.97 24.87 45.59 41.35
 
 JUNE 22-28, 1987
 County
 
 119
 Day of Arrest Bronx Kings New York Queens
 
 
 120
 06/22 (M) 31.25 22.80 30.05 21.25
 
 
 121
 06/23 (T) 33.74 24.32 34.17 22.84
 
 
 122
 06/24 (W) 30.76 26.95 35.57 22.83
 
 
 123
 06/25 (Th) 30.31 25.92 32.59 22.77
 
 
 124
 06/26 (F) 31.99 24.93 33.00 21.28
 
 
 125
 06/27 (Sa) 26.87 24.93 31.38 28.40
 
 
 126
 06/28 (Su) 20.41 23.31 30.2[?] 22.30
 
 
 127
 SEPTEMBER 7-20, 1987 *
 
 County
 
 128
 Day of Arrest Bronx Kings New York Queens
 
 
 129
 09/07 (M) 46.86 46.12 37.61 30.32
 
 
 130
 09/08 (T) 42.84 45.37 34.94 23.60
 
 
 131
 09/09 (W) 48.60 52.42 41.74 23.85
 
 
 132
 09/10 (Th) 59.81 61.22 48.54 25.18
 
 
 133
 09/11 (F) 70.79 66.43 57.52 31.20
 
 
 134
 09/12 (Sa) 71.45 69.04 60.56 35.89
 
 
 135
 09/13 (Su) 52.67 62.75 50.91 32.11
 
 
 136
 09/14 (M) 46.86 48.90 38.97 25.08
 
 
 137
 09/15 (T) 40.55 45.16 38.76 27.50
 
 
 138
 09/16 (W) 42.56 45.52 42.08 32.32
 
 
 139
 09/17 (Th) 46.65 49.55 43.60 31.52
 
 
 140
 09/18 (F) 47.09 51.64 46.39 34.37
 
 
 141
 09/19 (Sa) 50.97 50.17 46.71 38.89
 
 
 142
 09/20 (Su) 45.06 39.30 43.97 32.95
 
 
 143
 * From Affidavit of Steven G. Asin in Support of Plaintiff Appellants' Motion
 
 
 144
 to Vacate Stay of Injunctive Order, October 1, 1987, at 3.
 
 
 145
 STEWART, District Judge (dissenting).
 
 
 146
 The vast majority of courts that have considered the principles enunciated in Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) have held that an adult arrestee detained by a state must be provided a probable cause determination within twenty-four hours of arrest, if not sooner. See Bernard v. City of Palo Alto, 699 F.2d 1023, 1025 (9th Cir.1983) (per curium); Sanders v. City of Houston, 543 F.Supp. 694, 701-03 (S.D.Tex.1982), aff'd without opinion, 741 F.2d 1379 (5th Cir.1984); Lively v. Cullinane, 451 F.Supp. 1000, 1004 (D.D.C.1978); Cf. Dommer v. Hatcher, 427 F.Supp. 1040, 1046 (N.D.Ind.1975) (twenty-four hour maximum; forty-eight hours if Sunday is included), rev'd in part sub nom., Dommer v. Crawford, 653 F.2d 289 (7th Cir.1981). In holding that the determination of probable cause may constitutionally occur within seventy-two hours, the majority gives inadequate deference both to the Gerstein Court's stated reasons for requiring a prompt probable cause determination, and to the district court's fact-finding below.
 
 
 147
 Gerstein dictates that a neutral magistrate must review the probable cause bases for an arrestee's detention promptly after the police complete the "administrative steps incident to arrest." Gerstein, 420 U.S. at 114, 95 S.Ct. at 863. However, the Gerstein Court also recognized that the states provide probable cause determinations in a variety of procedural settings, and that it is a state's prerogative in the first instance to devise pretrial procedures that comport with the fourth amendment. Id. at 123-24, 95 S.Ct. at 867-68. In this case, the district court's declaratory judgment balances these two principles. The court found as a matter of fact that defendants can complete the steps incident to arrest within seven hours. However, the court did not compel the defendants to give arrestees an immediate probable cause hearing upon completion of these steps. Rather, the court found as a matter of fact that defendants could provide a probable cause determination within twenty-four hours using the present arraignment system, and held that this was a sufficiently prompt procedure under Gerstein.
 
 
 148
 As the majority correctly points out, Gerstein does not impose an absolute outside time limit for state probable cause determinations. However, Gerstein does make clear that a probable cause determination must "promptly" follow the completion of arrest procedures. Id. at 125, 95 S.Ct. at 869. While courts applying Gerstein have differed on exactly what administrative steps are "incident to arrest," they have used the completion of these steps as the datum point from which the timeliness of a probable cause determination is measured. Almost all of these courts have determined that "prompt" means a period of hours rather than days. See Bernard v. City of Palo Alto, 699 F.2d at 1025 (twenty-four hour maximum; however detention for less than twenty-four hours could run afoul of fourth amendment in individual case); Sanders v. City of Houston, 543 F.Supp. at 701-03 (twenty-four hour maximum); Lively v. Cullinane, 451 F.Supp. at 1004 (more than hour and-a-half detention gives rise to constitutional claim); see also, Gramenos v. Jewel Companies, Inc., 797 F.2d 432, 437 (7th Cir.1986) (four hour delay requires explanation for misdemeanant), cert. denied, --- U.S. ----, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987); Cf. Dommer v. Hatcher, 427 F.Supp. at 1046 (twenty-four hour maximum; forty-eight hours if Sunday is included).
 
 
 149
 The importance of a system that provides prompt probable cause determinations stems from the potentially serious consequences of prolonged detention. The Gerstein Court recognized that police officers must be able to make arrests on the basis of their own probable cause determinations. Once a suspect is in custody, however, "the reasons that justify dispensing with the magistrate's neutral judgment evaporate." Gerstein, 420 U.S. at 114, 95 S.Ct. at 863.
 
 
 150
 And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly. The consequences of prolonged detention may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships.
 
 
 151
 Id. A single day in jail is enough to endanger these interests. Obviously, three days without a probable cause determination poses an even greater risk. Moreover, extended periods of detention increase the possibility that an arrestee will be subject to physical and mental abuse by other arrestees. See Note, Granting Prosecutors' Requests for Continuances of Detention Hearings, 39 Stan.L.Rev. 761, 780 (1987).
 
 
 152
 The majority relies heavily on the Gerstein Court's apparent endorsement of a tentative draft of the American Law Institute's Model Code of Pre-Arraignment Procedure. See Gerstein, 420 U.S. at 124 n. 25, 95 S.Ct. at 868 n. 25.[1] However, the procedures outlined in this draft, unlike New York's arraignment system, provide for an initial appearance before a judicial officer within twenty-four hours of arrest.[2] Model Code of Pre-Arraignment Procedure Sec. 310.1(1) (Tent.Draft No. 5, 1972) [hereinafter 1972 Tentative Draft]. At the initial hearing of a person arrested without a warrant, the state must present an affidavit by a law enforcement officer or prosecutor supporting the arrest. Id. Sec. 310.1(2)(b). If the arrestee wishes to make a statement, the court must allow him to do so. Model Code of Pre-Arraignment Procedure Sec. 310.1(6) (Tent.Draft No. 5A, 1973) [hereinafter 1973 Amended Draft]. While the court is not required to make a determination of probable cause at the initial appearance, it is within its discretion to do so, and it may require the appearance of other witnesses for this purpose. Id. If this initial appearance does not occur within 24 hours, the arrestee is to be released "with a citation or on bail." 1972 Tentative Draft, supra, Sec. 310.1(1).
 
 
 153
 The initial appearance provided for in the ALI draft provides an essential safety valve not found in New York's present system. The value of the initial appearance is recognized in the notes to the 1973 Amended Draft:
 
 
 154
 [T]here might be some cases in which the arrested person could quite readily satisfy the magistrate that he had not committed the crime for which he had been arrested. Thus, for example, he might be able to show that he was not the person named in the affidavit or to account for his whereabouts at the time of the crime to the complete satisfaction of the magistrate. It seems desirable to make it clear that the magistrate is authorized to deal with such situations in a way which will avoid unnecessary incarceration and inconvenience for the arrested person. Therefore, the revised draft of Subsection (6) does make provision for those cases in which the magistrate does determine that there is not reasonable cause. Authorizing the magistrate to hear additional witnesses, when he concludes from the papers and testimony submitted by the parties that it is appropriate, is intended primarily as a means of implementing this provision.
 
 
 155
 1973 Amended Draft, supra, Sec. 310.1(6) note. In New York City at present, arrestees who can readily prove that they are being detained without probable cause must often wait two days or more until their arraignment to do so.[3]
 
 
 156
 The majority also relies on Schall v. Martin, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984). The issue in Schall was whether judicially ordered preventive detention pursuant to section 320.5(3)(b) of New York's Family Court Act comported with "fundamental fairness" required by the due process clause of the fourteenth amendment. Under section 320.5(3)(b), the family court may order that a juvenile be detained after his "initial appearance"[4] if the court determines that there is a "serious risk" that the child "may before the return date commit an act which if committed by an adult would constitute a crime." N.Y.Fam.Ct.Act 320.5(3)(b) (McKinney 1983). If the family court determines that a juvenile poses such a "serious risk," it may detain the juvenile after the initial appearance without making a finding of probable cause. Schall, 467 U.S. at 276, 104 S.Ct. at 2416. The juvenile is afforded a probable cause hearing that takes place as much as seventy-two hours after the initial hearing.[5]
 
 
 157
 While the family court may detain a juvenile for up to three days after an initial hearing without a showing of probable cause, the initial appearance itself provides a number of safeguards against unwarranted detention. As described in Schall, at the initial appearance the juvenile is given notice of the charges against him and is informed of his rights. The juvenile is accompanied by his parent, guardian, or court-appointed law guardian. The non-hearsay portions of the delinquency petition[6] and supporting affidavits are reviewed by the judge and must establish probable cause to believe the juvenile committed the offense. Although the family court is not required to make a finding of probable cause, the juvenile may attack the sufficiency of the delinquency petition on that ground at his initial hearing. Id. at 275-76, 104 S.Ct. at 2416-17.
 
 
 158
 Thus, while the initial appearance focuses on the question of the juvenile's future dangerousness, it also allows the juvenile to dispute the existence of probable cause before being detained under section 320.5(3)(b). Moreover, the papers supporting detention must contain information establishing probable cause that the juvenile committed the offense alleged in the delinquency petition. In the case at bar, the plaintiff class is afforded no analogous procedural safeguards prior to the probable cause determination at arraignment.
 
 
 159
 More importantly, the Schall Court's approval of a procedure that emphasizes the issue of future dangerousness, rather than the issue of probable cause, reveals a fundamental concern present in that case not present in the case at bar. The legislative purpose behind preventive detention in Schall was not only to protect society from the delinquent juvenile, but also to protect the juvenile from himself. Id. at 265-66, 104 S.Ct. at 2410. The state acts as parens patriae for juvenile offenders; the state does not have this paternalistic duty with respect to the plaintiff class in this case. The Schall Court found that a juvenile's liberty interest is
 
 
 160
 qualified by the recognition that juveniles, unlike adults, are always in some sort of custody. (Citations omitted.) Children, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as "parens patriae. (Citations omitted.) In this respect, the juvenile's liberty interest may, in appropriate circumstances, be subordinated to the State's 'parens patriae interest in preserving and promoting the welfare of the child."
 
 
 161
 Schall, 467 U.S. at 265, 104 S.Ct. at 2410 (quoting Santosky v. Kramer, 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599 (1982). Thus, an underlying premise in the Schall decision is that a juvenile's liberty interest in freedom from institutional constraints is less substantial than an adult's.
 
 
 162
 The majority also faults the district court's factfinding. The district court found as matters of fact that defendants could complete the steps incident to arrest within seven hours and the remaining steps necessary to complete arraignment within twenty-four hours of an arrest. The burden is on the defendants to demonstrate that these findings of fact are clearly erroneous, Stafford v. International Harvester Co., 668 F.2d 142, 147 (2d Cir.1981), yet nowhere in their brief do they discuss this standard or specify how the district court's findings are erroneous.[7] When a "district court's account of the evidence is plausible in light of the record viewed in its entirety, [a] court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). A Court of Appeals may not review de novo defendants' arrest procedures to determine whether or how these procedures can be streamlined. Id. It is sufficient that the district court's findings are supported by some evidence and do not leave this Court, upon consideration of the evidence as a whole, "with the definite and firm conviction that a mistake has been committed." Id. at 573, 105 S.Ct. at 1511 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).
 
 
 163
 I agree with the majority that the district court's findings that defendants can complete the steps incident to arrest within seven hours and the remaining steps necessary for arraignment within twenty-four hours are conclusory. The district court has not made subsidiary findings specifying where the present arrest-to-arraignment procedures can be streamlined. Without these subsidiary findings, it is impossible for this Court to determine whether the district court's findings concerning the feasible completion times for arrests and arraignments are clearly erroneous. See Mozee v. Jeffboat, Inc., 746 F.2d 365, 370 (7th Cir.1984); De Medina v. Reinhardt, 686 F.2d 997, 1011 (D.C.Cir.1982); Ballard v. Rockville Centre Housing Authority, 605 F.2d 1283, 1289 (2d Cir.1979).
 
 
 164
 However, I am not convinced by the majority's argument that the findings below are actually legal conclusions about the temporal limits placed on New York's arraignment system by the Constitution. The parties' Stipulated Statement of Facts, which is admittedly opaque regarding bottlenecks in New York's arraignment system, was not the only evidence before the district court. The court below monitored the parties' progress for two years and five months. At an April 3, 1986 hearing before the court below, the City's attorneys themselves suggested that they could achieve an average arrest-to-arraignment time of twenty-four hours. Moreover, the record is replete with references to the cooperation of other actors in the arraignment system who are not parties to this suit. Accordingly, the district court's findings may not be summarily dismissed as unrealistic and without factual basis.
 
 
 165
 Therefore, I would remand the case to the district court for further findings. If after further factfinding in the district court it appears that defendants do in fact need the 11-15 hours that they currently require to complete the steps incident to arrest--and can do no better without placing substantial strain on the City's limited resources--then it may be permissible under Gerstein to allow the defendants to provide arraignments somewhat more than twenty-four hours after arrest. However, even using this 11-15 hour average as a benchmark for measuring the timeliness of the probable cause determination--as we must under Gerstein--the majority's seventy-two hour outside time limit is clearly excessive.
 
 
 166
 If it were to appear after further factfinding that defendants cannot improve on the June 1987 City-wide average arrest-to-arraignment time of thirty-three hours, Gerstein would require that defendants provide arrestees a separate, abbreviated probable cause hearing that follows closely the completion of the administrative steps incident to arrest. However, this Court need not, indeed should not, make that determination without a complete factual record before it.
 
 
 167
 For the reasons stated, I respectfully dissent.
 
 
 
 *
 The Honorable Charles E. Stewart, Jr., United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 In the Midtown South Precinct in Manhattan, however, fingerprints are transmitted to DCJS through the use of the precinct's own electronic equipment
 
 
 [2]
 In New York County, the detention facilities set aside for arrestees in the courthouse are open twenty-four hours each day and can hold 263 arrestees. In Kings County, the detention facilities set aside for arrestees are capable of holding 150 arrestees while the arraignment court is in session, and 60 arrestees overnight when the arraignment court is not in session. In Queens County, the detention facilities set aside for arrestees can hold 72 arrestees while the arraignment court is in session; arrestees are held overnight in the central booking facility in the courthouse when the arraignment court is not in session. In Bronx County, courthouse detention facilities can hold 142 arrestees while the arraignment court is in session, and in a temporary arrangement begun in September 1986, 45 arrestees can be held overnight when the arraignment court is not in session. The number of arrestees held is determined by the City of New York. The rated capacities of detention facilities for arrestees are established by the City of New York. In each county, arrestees are segregated in the detention facilities into the following groups: male adults, male youths, females and (in New York County) homosexuals. Segregation requirements reduce the maximum capacity of these facilities
 
 
 [3]
 In general, the Society assigns three or four staff attorneys to each arraignment session. The overnight "lobster" shift in New York County and the weekend shifts in Queens County, however, each have only two attorneys, and the weekday shifts in Queens County have two staff attorneys and a supervisor. In addition, each arraignment session is staffed by one or more attorneys who are not associated with the Society. In the Bronx and Queens, the Society assigns supervisors to supervise staff attorneys as well as to accept court assignments. In Kings County, supervisors are assigned on a rotating basis to the day shift from 8:30 a.m. to 10:00 a.m. In New York County, supervisors are present during the day, night and overnight shifts
 
 
 [4]
 The parties limited the scope of their Stipulated Statement of Facts to the experience of arrestees represented by The Legal Aid Society, presumably because most members of the plaintiff class are represented by the Society and because of the parties' familiarity with the procedures of the Society
 
 
 [5]
 The parties have not explained why the average times so greatly exceed the median times. It would be reasonable to estimate from these statistics, however, that while approximately one-half of the cases take approximately three-quarters of an hour to prepare, the remaining half take an average of at least two to four hours. And it appears that some of the cases do, in fact, take quite a long time for defense counsel to prepare: During the period extending from October 13 to October 18, the daily maximum times were 21.5, 10.5, 10.5, 14.3 and 13.1 hours, respectively
 
 
 [6]
 The parties have stipulated that plaintiffs Williams, Altman, Richards and Lewis were held approximately fifty-five, forty-nine, fifty-six and fifty-six hours, respectively, before their arraignments. Although the named plaintiffs have thus long ago obtained probable-cause reviews of their arrests, this case is of course not moot for the same reason that the class actions in Schall v. Martin, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), and Gerstein v. Pugh were not mooted by the termination of the claims of the class representatives in those cases:
 Pretrial detention is by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either released or convicted. The individual could nonetheless suffer repeated deprivations, and it is certain that other persons similarly situated will be detained under the allegedly unconstitutional procedures. The claim, in short, is one that is distinctly "capable of repetition, yet evading review."
 Gerstein, 420 U.S. at 110 n. 11, 95 S.Ct. at 861 n. 11 (quoting Southern Pac. Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)); see also Schall, 467 U.S. at 256 n. 3, 104 S.Ct. at 2405 n. 3.
 
 
 [7]
 The parties' efforts at settlement have been raised as an issue before the district court and before this court
 
 
 [8]
 On July 7, 1987, five days after issuing its declaratory judgment and permanent injunction, the district court certified a class of "[a]ll persons in New York, Bronx, Kings and Queens Counties in the City of New York who now or in the future are arrested without a warrant and held in detention by defendants prior to having the probable cause bases of their arrests reviewed by a magistrate." Although Fed.R.Civ.P. 23(c)(1) provides that, "[a]s soon as practicable after the commencement of an action, the court shall determine by order" whether an action shall be maintained as a class action, defendants do not contest the validity of the class certification
 
 
 [9]
 The district court stayed the injunction for ten days but denied an application for a further stay on July 9, 1987. On the following day, defendants appealed. At the same time, they filed an application for a stay in this court, which Judge Newman granted until July 14, when the application could be heard by a three-judge panel. On July 14, a panel of this court stayed the injunction until oral argument; at oral argument, the stay was extended pending the disposition of the appeal
 
 
 [10]
 In its Opinion and Final Judgment, the district court in Gerstein ordered defendants to submit a plan for conducting preliminary hearings before judicial officers in all criminal cases initiated by direct information. Pugh v. Rainwater, 332 F.Supp. 1107, 1116 (S.D.Fla.1971). The district court adopted a plan under which a defendant would be entitled, within three hours of arrest, to a "first appearance hearing" at which a magistrate would (1) advise the defendant of his rights and of the charges against him; (2) appoint counsel if the defendant was indigent; and (3) set a date and time for a preliminary hearing to determine whether probable cause exists. Pugh v. Rainwater, 336 F.Supp. 490, 491 (S.D.Fla.1972). Under the plan adopted by the district court, a preliminary hearing must be held within four days of the first appearance. Id. at 491, 492. Defendants subsequently appealed
 While the appeal was pending, the Supreme Court of Florida amended that state's Rules of Criminal Procedure to provide defendants not charged by information or indictment with preliminary hearings, at which probable cause would be determined, within four days of arrest. The Fifth Circuit accordingly directed the district court to reconsider its plan in light of the new rules. The district court held that the denial of preliminary hearings to individuals charged by information was unconstitutional, and reaffirmed its earlier plan. Pugh v. Rainwater, 355 F.Supp. 1286 (S.D.Fla.1973), aff'd in part and vacated in part, 483 F.2d 778 (5th Cir.1973), aff'd in part and rev'd in part sub nom. Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).
 On appeal, the Fifth Circuit agreed that a preliminary hearing procedure should be accorded defendants charged by information. The court nevertheless vacated the part of the district court's plan that imposed a strict four-day limit on the period between an arrest and the preliminary hearing. The court of appeals concluded that the provisions of the amended rules should be made applicable to prosecutions by direct information. Pugh v. Rainwater, 483 F.2d 778, 788 (5th Cir.1973), aff'd in part and rev'd in part sub nom. Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). The amended rules provided that initial appearances would be held within twenty-four hours of arrest, and that preliminary hearings would be held within seventy-two hours of initial appearances. The rules provided, however, that "[w]hen the period of time [between arrest and preliminary hearing] shall be less than 7 days, intermediate Saturdays, Sundays and legal holidays shall be excluded in computation." Id. (quoting Fla.R.Crim.P. 3.040).
 Appellants argued that the application of Florida's amended rules would be unconstitutional because it would frequently allow six days to pass between arrest and the preliminary hearing. In response, the court stated:
 Whether a four-day lapse is constitutional while a six-day lapse is not would be a difficult factual question. We need not, however, face this nice question, because no appellant argues that he has been accorded a preliminary hearing more than four but less than six days after his arrest.
 However, because the District Court's ... order established an across-the-board four-day maximum lapse period which conflicts with Rule 3.040, we cannot allow both the [court's] [p]lan and the Rule to coexist in their inconsistency. We therefore vacate that portion of the [district court's] order which set a four-day maximum period on the ground that it was unnecessary to the disposition of this case.
 Id.
 
 
 [11]
 The Court denied plaintiffs' petition for a writ of certiorari. Pugh v. Gerstein, 414 U.S. 1077, 94 S.Ct. 595, 38 L.Ed.2d 484 (1973)
 
 
 [12]
 Citing the fact that a court is authorized to find a lack of "reasonable cause" at a first appearance under the draft Model Code, plaintiffs contend that it is "misleading" to suggest that "the Code permits a probable cause determination to be made as late as two days after an arrestee's initial appearance." Appellees' Br. at 26. We disagree. The draft Model Code states that, at the first appearance, "[t]he court need not determine whether there is reasonable cause to believe the arrested person committed the crime of which he is accused." Model Code of Pre-Arraignment Procedure Sec. 310.1(6) (Tent. Draft 5A, 1973); see also Model Code of Pre-Arraignment Procedure Sec. 310.1(6) (1975) (same). Moreover, the Note to Section 310.1(6) of the final draft of the Model Code acknowledges that "it will rarely be possible immediately after the arrest for the magistrate to pass on the existence of reasonable cause." The note to Section 310.1(8) further observes that:
 "[i]t is unrealistic to expect effective judicial screening within a few hours after the arrest and it is important that an arrested person with the aid of his lawyer have some time to try to make arrangements for bail or other pretrial release. If the arrested person has counsel he should be able to waive or agree to postponement of the adjourned session. However, if there is no such waiver or postponement it seems reasonable that a person in custody have a right to have the adjourned session take place within 48 hours."
 Model Code of Pre-Arraignment Procedure Sec. 310.1(8) note (1975).
 
 
 [13]
 The interplay of various provisions of the Family Court Act can result in the delay of probable-cause hearings until more than nine days have passed after an arrest. Specifically, an initial appearance may be conducted as many as seventy-two hours after arrest when the Family Court is not in session. See N.Y.Fam.Ct.Act Sec. 320.2(1) (McKinney 1983). In addition, "[f]or good cause shown," the Family Court may adjourn a probable-cause hearing "for no more than an additional three court days." Id. Sec. 325.1(3). Indeed, Gregory Martin and Kenneth Morgan, class representatives in Schall, were detained six days, see 467 U.S. at 257-58, 104 S.Ct. at 2406, and ten days, United States ex rel. Martin v. Strasburg, 513 F.Supp. 691, 696 (S.D.N.Y.1981), aff'd, 689 F.2d 365 (2d Cir.1982), rev'd sub nom. Schall v. Martin, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), respectively, before their probable-cause hearings
 
 
 [14]
 The Schall Court observed that "Gerstein indicated approval of pretrial detention procedures that supplied a probable-cause hearing within five days of the initial detention." Schall, 467 U.S. at 277 n. 28, 104 S.Ct. at 2416 n. 28 (citing Gerstein, 420 U.S. at 124 n. 25, 95 S.Ct. at 868 n. 25). To the extent that this statement refers to Gerstein's approval of procedures under the American Law Institute's Model Code of Pre-Arraignment Procedure, it is accurate: The Model Code's requirement that an "adjourned session" must be held within two "court days" implies that a person who is arrested on the day preceding a three-day weekend might not receive a probable-cause hearing until the fifth day after his arrest. But to the extent that Schall's footnote 28 appears to refer to Gerstein's approval of the Uniform Rules of Criminal Procedure (Proposed Final Draft 1974), it is misleading: Under the Uniform Rules, an arrestee is entitled to two probable-cause hearings, the first to be held immediately after arrest, the second--an adversarial hearing--to be held within five days. See Gerstein, 420 U.S. at 124 n. 25, 95 S.Ct. at 868 n. 25
 
 
 [15]
 Accordingly, we disagree with the cases relied upon by the district court, Bernard v. City of Palo Alto, 699 F.2d 1023 (9th Cir.1983) (per curiam); Sanders v. City of Houston, 543 F.Supp. 694 (S.D.Tex.1982), aff'd mem., 741 F.2d 1379 (5th Cir.1984); and Lively v. Cullinane, 451 F.Supp. 1000 (D.D.C.1978), and with other similar cases, see Gramenos v. Jewel Cos., 797 F.2d 432 (7th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987); Doulin v. City of Chicago, 662 F.Supp. 318 (N.D.Ill.1986). Although these cases differ on what constitutes the "administrative steps incident to arrest," each holds that arrestees must be provided with probable-cause hearings immediately upon completion of those steps. None, however, takes into account the totality of the processes afforded the arrestees by the particular criminal justice system, an inquiry we believe is required by Gerstein. Moreover, none involved arraignment systems similar to New York City's
 
 
 [16]
 Under New York law, "[a] misdemeanor complaint or a felony complaint, or a count thereof, is sufficient on its face when ... [t]he allegations of the factual part of such accusatory instrument and/or any supporting depositions which may accompany it, provide reasonable cause to believe that the defendant committed the offense charged...." N.Y.Crim.Proc.Law Sec. 100.40(4)(b) (McKinney 1981). "Reasonable cause" under the Criminal Procedure Law "is substantially the same as 'probable cause' within the meaning of the Fourth Amendment." Greene v. Brown, 535 F.Supp. 1096, 1100 (E.D.N.Y.1982)
 
 
 [17]
 During the period between January 5 and May 24, 1987, 36% of all arraignments in New York City resulted in final dispositions. The corresponding figure for Manhattan during this period was 48%
 
 
 [18]
 Plaintiffs make three arguments in seeking to distinguish Schall. Each is without merit
 First, plaintiffs note that the Schall opinion stated that it was not addressing the question of whether detention before a juvenile's initial appearance was constitutional. See Schall, 467 U.S. at 257 n. 5, 104 S.Ct. at 2406 n. 5. This observation, however, does not negate the fact that the Court specifically upheld a delay of the probable-cause determination beyond--indeed, seventy-two hours beyond--the initial appearance. As the initial appearance in Schall is not a probable-cause hearing under Gerstein, a fortiori the Court held that there was no constitutional violation in delaying the probable-cause determination for (at least) seventy-two hours after arrest.
 Second, plaintiffs would distinguish Schall on the ground that, under the Court's reading of Section 315.1 of the Family Court Act, the initial appearance provides an opportunity for probable-cause review. See Schall, 467 U.S. at 275-76, 104 S.Ct. at 2415-16. Aside from the fact that the Court's interpretation of the Act is open to serious question, see Schall, 467 U.S. at 285 n. 6, 104 S.Ct. at 2406 n. 6 (Marshall, J., dissenting), we think that plaintiffs' argument must fail because the Court emphasized that there was no constitutional requirement that the Family Court determine probable cause at the first appearance. See id. at 276 n. 27, 104 S.Ct. at 2416 n. 27. The Court thus did not rely on its interpretation of Section 315.1 in upholding the Family Court Act.
 Third, plaintiffs observe that, "[w]hatever its import, insofar as Schall adjudicated the rights of juveniles[,] its relevance to the claims of plaintiffs here ... is limited." Appellees' Br. at 28 n. 17. The Schall Court, however, did not purport to rely on appellees' status as juveniles in upholding the probable-cause procedures of the Family Court Act. Nevertheless, because Schall did in fact involve the detention of juveniles, we think that decision cannot be read to support prearraignment detentions comparable to the actual delays experienced in obtaining probable-cause hearings under the Family Court Act. See supra note 13.
 
 
 [19]
 A recent experiment conducted in Manhattan supports the conclusion that a probable-cause hearing before arraignment would have detrimental effects upon the plaintiff class. Between July 28 and August 3, 1987, the City's Criminal Court began providing separate probable-cause hearings for persons arrested in New York County. Criminal Court judges sitting in the arraignment parts reviewed sworn complaints as soon as the complaints were drafted. Of the 1407 complaints examined, only 69 were found to be defective because they failed to establish probable cause. Of those 69 complaints, 56 were satisfactorily redrafted by the District Attorney's Office. Thus, probable cause was found to be lacking in only 13 of the 1407 cases. According to the Hon. Milton L. Williams, the Deputy Chief Administrative Judge for the City's courts, the experiment
 engrafted a cumbersome additional procedure onto the arrest-to-arraignment process that ... resulted in the accelerated release (by maybe a handful of hours) of less than 1% of all arrestees, while at the same time delaying the release of two-thirds of all arrestees who normally are released at the time of arraignment either through disposition by plea or by posting bail.
 Supplemental Affidavit of Judge Milton L. Williams, August 6, 1987, at 5.
 
 
 [20]
 In response to the City's question of whether the district court would consider joinder to facilitate compliance with its judgment, the district court responded:
 No. All you do is release all these people and then maybe they won't arrest so many and make the system so overworked. I think this is the best way....
 Transcript of Hearing, July 2, 1987, at 113.
 
 
 [21]
 The extent of The Legal Aid Society's staffing of arraignment parts has apparently been a source of contention among Criminal Court administrators, the City and the Society. In a memorandum dated April 9, 1987, the Hon. Robert G.M. Keating, Administrative Judge of the Criminal Court, stated that:
 Between fiscal year 1986 and 1987 the Legal Aid Society's budget increased from [$]37,141,000 to [$]41,484,000 according to the [City's] Office of Management and Budget. In the face of an ever increasing number of arraignments, the Legal Aid Society now staffs fewer parts than they did a year ago. In 1987 every other agency or branch of government has cooperated to staff the extra court sessions that have been convened to expedite arraignments. The Legal Aid Society has not been able to assign 1 attorney to these parts. The absence of an adequate number of attorneys in these parts has severely limited our ability to expedite arraignments in arrest cases. Additionally, the forced reassignment of 18B cases after arraignment has caused troubling instances of defendants unrepresented at critical times in the court process. Despite a substantial and continuing increase in fiscal resources, the Legal Aid Society has not, to this point, expanded their attorney assignments to efficiently process recent high volume arrest intake.
 Although defendants continue to assert that the Society should be joined as a necessary party, they do not independently contest the Society's representation of the plaintiff class.
 
 
 [22]
 In light of our decision on the merits of the district court's injunction and declaratory judgment, we find it unnecessary to address other issues raised by defendants, including defendants' contention that the district court erred in denying their joinder motion
 
 
 [1]
 The Court cited the 1972 Tentative Draft, and the 1973 amendment to portions of this draft
 
 
 [2]
 An arrestee who has consulted with counsel may waive this appearance. Model Code of Pre-Arraignment Procedure Sec. 310.1(1) (Tent. Draft No. 5, 1972)
 
 
 [3]
 The majority states that engrafting a separate probable cause hearing onto the present system will delay arraignments for the majority of arrestees. In support of this assertion, the majority cites an August 6, 1987 Affidavit of Judge Milton Williams discussing a week-long "experiment" conducted in New York County in which an abbreviated probable cause determination was afforded each arrestee immediately after completion of the steps incident to arrest. As discussed below, the district court found that the addition of such a probable cause hearing is unnecessary because timely probable cause determinations can be provided under the present arraignment system. In any event, because of its brevity, and the fact that it was limited to only one of the four counties encompassed by this action, the experiment is of limited probative value. In fairness to defendants, they may have felt compelled to devise such a procedure to avoid being held in contempt of the district court's injunctions. Accordingly, it might have been preferable for the district court to give defendants a grace period in which to comply with its declaratory judgment, rather than imposing injunctive relief concomitantly with the declaratory judgment
 
 
 [4]
 The "initial appearance" is the juvenile's first appearance before the Family Court after delinquency proceedings formally commence. Schall, 467 U.S. at 258 n. 7, 104 S.Ct. at 2406 n. 7
 
 
 [5]
 Under the Family Court Act, a juvenile may be detained under certain circumstances for up to seventy-two hours prior to this initial appearance. See N.Y.Fam.Ct.Act Sec. 320.2(1). However, the constitutionality of detention prior to a juvenile's initial appearance was not before the Schall Court. Schall, 467 U.S. at 257 n. 5, 104 S.Ct. at 2406 n. 5. The Court was solely concerned with whether preventive detention following the initial hearing, and the procedures developed for implementing such detention, comported with due process. Schall, 467 U.S. at 263-64, 104 S.Ct. at 2409
 
 
 [6]
 The delinquency petition originates delinquency proceedings. "The petition must contain, inter alia, a precise statement of each crime charged and factual allegations that 'clearly apprise' the juvenile of the conduct which is the subject of the accusation." Schall, 467 U.S. at 258 n. 6, 104 S.Ct. at 2406 n. 6 (cite omitted)
 
 
 [7]
 Of course, this court is not governed by the clearly erroneous standard of review if the district court conducted its factfinding under a misapprehension of the applicable legal standard. See Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co., 644 F.2d 1132, 1138 (5th Cir.1981). As noted above, I think that the district court did not err in its interpretation of the principles enunciated in Gerstein